HELLER, HURON, CHERTKOF & SALZMAN
PLLC
ATTORNEYS AT LAW

1730 M STREET, NW • SUITE 412
WASHINGTON, DC 20036

*rec'd ,,|5/14*
*g√ √ certified*

(202) 293-8090
FAX: (202) 293-7110
E-MAIL: info@hellerhuron.com

October 31, 2014

**By Certified Mail, Return Receipt Requested**
Irvin B. Nathan
Office of the Attorney General of the District of Columbia
441 4th Street, NW, Washington, DC 20001

Re:  Mawakana v. Board of Trustees of the University of the District of Columbia

Dear Mr. Nathan or Designated Representative:

I have enclosed two copies of the Complaint, Summons and Initial Scheduling Order in the case of Mawakana v. The Board of Trustees of the University of the District of Columbia, 2014 CA 006242 B, for service upon the Mayor and Attorney General in this matter.  I was informed by a member of your staff that both packages (one for the Mayor and one for the Attorney General) should be submitted to your office.  If that is not correct, please let me know at your earliest opportunity.

Please note that Judge Okun has issued a *sua sponte* order changing the date of the initial scheduling conference from January 2, 2014 to February 6, 2014, a copy of which I have attached.

Thank you for your attention to this matter.

Sincerely,

Richard A. Salzman

**EXHIBIT A**



rec'd. 11/5/14
8vr
cert. mail
1:30 cops
DAG cops

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

KEMIT MAWAKANA
    Vs.                            C.A. No.    2014 CA 006242 B
THE BOARD OF TRUSTEES OF THE UNIVERSITY OF THE DIS

### INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to: Judge ROBERT D OKUN
Date:  October 2, 2014
Initial Conference: 9:30 am, Friday, January 02, 2015
Location:  Courtroom 317
          500 Indiana Avenue N.W.
          WASHINGTON, DC  20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www:dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Kemit Mawakana

_____
Plaintiff

vs.

The Board of Trustees of the
University of the District of Columbia
_____
Defendant

Case Number **14 - 0 0 0 6 2 4 2**

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Karl A. Salzman
_____
Name of Plaintiff's Attorney

1730 M Street, NW - Ste 412
_____
Address

Washington, DC 20036

(202) 293 - 8090
_____
Telephone

Clerk of the Court

By _____
Deputy Clerk

Date 10/2/14

如需翻译，请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시요    ያስተረጉም ከፈለጉ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-682-2700) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011

CASUM.doc



SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

KEMIT MAWAKANA     )
4205 Plummers Promise Drive   )
Bowie, MD 20720      )
      Plaintiff,   )  **14 - 0 0 0 6 2 4 2**
           ) Civil Action No.
  v.        )
           )
THE BOARD OF TRUSTEES OF THE  )
UNIVERSITY OF THE DISTRICT OF COLUMBIA )
4200 Connecticut Ave., NW    )
Washington, DC 20008     )
           )
           )
     Defendant.  )
_____)

RECEIVED
Civil Clerk's Office
DEC 02 2014
Superior Court of the
District of Columbia
Washington, D.C.

## COMPLAINT
### (Discrimination in Employment)

1. The University of the District of Columbia (UDC) imposes disparate (and more onerous) standards on African-American professors seeking tenure and promotion within its law school – the David A. Clark School of Law. In the past three years, at least five professors have applied for tenure. UDC rejected the tenure applications of all three African-American professors, despite their outstanding qualifications, while both white applicants (with objectively less impressive credentials) sailed successfully through the tenure and promotion process. Racial discrimination is troubling under any circumstances, but especially intolerable here given UDC's status as a Historically Black College/University. UDC's student body has protested these racially discriminatory tenure denials, but the administration remains steadfast in its refusal to change course.

2. Kemit Mawakana is a talented and dedicated professor of law, who met or exceeded every published criteria for the grant of tenure and promotion to Full Professor, but

UDC denied him these benefits of employment because of his race. After refusing him tenure for racially biased reasons, UDC then wrongfully terminated Professor Mawakana's employment with the university, thus effectively ending his career in academia. This lawsuit seeks compensation for those injuries under both local and federal law. In addition to engaging in race discrimination, UDC also breached its employment contract with Professor Mawakana by failing to abide by the tenure and promotion policies adopted by his contract, and violated the covenant of good faith and fair dealing underlying that contract. Plaintiff also seeks relief for the damage caused by these actions.

### Jurisdiction and Venue

3.      This lawsuit arises under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1402.11 et seq., Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981 and 1983, to remedy defendant's discriminatory refusal to grant tenure and/or promotion to Plaintiff because of his race, as well as Defendant's breach of its employment contract with Plaintiff. This Court has jurisdiction under D.C. Code Ann. § 2-1403.16, and D.C. Code § 11-921(a) because the discriminatory and otherwise unlawful actions challenged in this lawsuit occurred in the District of Columbia.

### Parties

4.      Plaintiff Kemit Mawakana is a resident of the State of Maryland.

5.      Defendant, the Board of Trustees of the University of the District of Columbia, is the entity vested with the responsibility of governing the University of the District of Columbia and is authorized to "sue and be sued" on behalf of the University. D.C. Code § 38-1202.01. Defendant (hereinafter referred to as "UDC") conducts its business in the District of Columbia,

2

and is an "employer" as defined by both the DCHRA and Title VII.

## Facts

6.      Kemit Mawakana (formerly Samuel Jefferson) is a graduate of Georgetown University and the Georgetown University Law Center, where he served as a founding member and associate editor of the Georgetown Journal on Poverty & Law Policy. After graduating from Georgetown University Law Center, Professor Mawakana served as a Judicial Clerk for the United States District Court, District of Columbia, and then gained extensive experience as a litigator in the private practice of law with a prominent D.C. law firm. Prior to joining the faculty with UDC, Professor Mawakana taught in the Harrison Institute Community Development Clinic at Georgetown University Law Center. He was exceptionally well-qualified to teach law at UDC.

7.      UDC hired Professor Mawakana as an Assistant Professor on tenure track to begin teaching in the Fall 2006 semester. His primary course assignments were to teach Contracts I and Contracts II, and to co-teach UDC's Community Development Clinic (CDC). In the fall of 2009, Professor Mawakana applied for promotion to the rank of Associate Professor; UDC renewed Professor Mawakana's contract of employment and then promoted him to the rank of Associate Professor in October 2010. He became eligible to apply for tenure in 2011.

### Race Discrimination

8.      Shelley Broderick is the Dean of the David A. Clark School of Law, and has served in that capacity during the entirety of Professor Mawakana's employment with UDC. Dean Broderick exercises tremendous influence over the tenure and promotion process, and she freely discloses to other faculty members exercising key roles her personal views about whether

3

or not a particular applicant should be granted tenure and/or promotion.

9.      In considering applicants for tenure, UDC reviews the professor's credentials in three areas – teaching, service and scholarship.

10.      Professor Mawakana applied for tenure in a timely manner in July 2011. He met or exceeded *all* of the criteria as set forth in the UDC Faculty Handbook and in the "Standards and Procedures For Retention And Tenure" adopted by UDC and its faculty.

11.      With respect to his demonstrated ability as a teacher, peers reviewing and reporting on Professor Mawakana's effectiveness described him as "skillful" in responding to student queries, observed that his course syllabus were "very thorough," and summarized that "we found that Professor Jefferson [1] delivered good quality legal instruction that properly immerses the students in the basic principles of contract law; and we observe that his teaching gets better each year." Reporting on his effectiveness leading and teaching students in the CDC clinic, peers described Professor Mawakana as "an excellent clinician," noting that "this conclusion is echoed by the student evaluations which are uniformly excellent with virtually all 5's and 4's. His co-teachers in the clinic also give him high marks."

12.      During the tenure application review process, UDC determined that Professor Mawakana satisfied the teaching criteria sufficient to support an award of tenure.

13.      With respect to his service to the Law School and University, early in his tenure the Dean of the Law School and President of the University specifically asked Professor Mawakana to serve in a unique role -- as the Faculty Athletic Representative (FAR) -- capitalizing on his previous career as a standout college and professional basketball player, as

---

[1] At the time this report was written, Plaintiff's name was Samuel Jefferson; he subsequently changed his name to Kemit Mawakana.

4

well as his prior legal experience in the field of sports and entertainment law. In that role,

Professor Mawakana provided several years of outstanding service to the University, summarized

in a FERC report as follows:

> This position is a direct report to the president; during his three years the
> university has had three different presidents, each with a different mission and set
> of priorities. There were also three different athletic directors who also had their
> own agenda and priorities. The athletic department was facing the largest number
> of NCAA infractions in history and was severely underfunded. The underfunding
> meant, among other things, reduced staffing, which placed an added burden on
> Professor Jefferson, especially with compliance and academic support issues. He
> played a key role in stopping the infractions and developing a framework for
> future compliance. This year round activity has entailed untold numbers of
> meetings with faculty, administrators, outside counsel and so forth.

14. Because of the demands of this FAR assignment, both Dean Broderick and former

Dean William Robinson assured Professor Mawakana that his work as the FAR would satisfy his

service obligation, and that he would be relieved from other more traditional forms of service to

the law school, such as serving on law faculty committees. However, notwithstanding this

promise, Professor Mawakana repeatedly volunteered and diligently served in other roles for both

the Law School and University, including his service on numerous faculty committees, his role as

a student advisor to individual law students, and as the faculty advisor to multiple student

organizations.

15. During the tenure application review process, UDC determined that Plaintiff

satisfied the service criteria sufficient to support an award of tenure.

16. UDC relied upon just one of the criteria – scholarship – to try to justify rejecting

Professor Mawakana's candidacy for tenure and promotion (and thus paving the way for the

termination of his employment with the University).

17. UDC's assertion that Professor Mawakana failed to satisfy the scholarship criteria

necessary for an award of tenure is false, not credible, contrary to its own published standards and practices with regard to reviewing a professor's scholarship, and was merely a pretext to mask racial discrimination.

18.    UDC's tenure policies with respect to the scholarship criteria state that "as part of the application for promotion from Associate Professor to Professor and for the award of tenure, the applicant normally must submit at least three published scholarly works of quality or three scholarly equivalents [sic] works related to the practice of law . . . "

19.    Professor Mawakana satisfied this standard; he had published four articles, three of them in well-respected law review journals, all of high quality. Indeed, two of Professor Mawakana's four published articles were nominated for prestigious national awards.

20.    Professor Mawakana's article "*Historically Black Colleges and Universities: Generating Multitudes of Effective Social Engineers*" was nominated for the Duke University Law and Society John Hope Franklin Award.

21.    Professor Mawakana's article "*In the Wake of Coast Federal: The Plain Meaning Rule and the Anglo-American Rhetorical Ethic*, won Honorable Mention as one of the Top 5 Contract Law articles of 2011 (a recognition voted upon by contract law professors around the country). UDC publicized this honor on its website and in other materials.

22.    With respect to Professor Mawakana's third published article, *Power and the Law, Bait and Switch, Debunking "Law" as a Tool of Societal Change: The Disappearing Act of Affordable Housing in the District of Columbia*, published by the Oklahoma City Law Review, UDC itself concluded that "Professor Mawakana has written a scholarly article that is a 'contribution to the growth and understanding of the law'" in its FERC report recommending his promotion to Associate Professor.

6

23.     In addition to the four published articles, Professor Mawakana had several works in progress, and an established research agenda. He also was a frequent guest speaker at professional conferences, all of which are considered as evidence of good scholarship at UDC.

24.     UDC subjected Professor Mawakana to disparate and more onerous standards, and to far greater scrutiny, in its effort to justify rejecting his application for tenure and promotion.

25.     Moreover, UDC's application of disparate standards is racially based, as white professors with far less impressive credentials in the area of scholarship, teaching and service have been granted tenure and promotion, while other African-American professors have similarly been rejected.

26.     For example, UDC granted tenure to William McLain in 2012, and promoted him to Full Professor which resulted in a substantial (upon information and belief, a roughly $50,000) raise in his annual compensation. Professor McLain filed his application for tenure late, and his qualifications for tenure were demonstrably inferior to those presented by Professor Mawakana (and other black applicants). Whereas Plaintiff had published multiple award winning (or nominated) articles in respected law journals, McLain offered zero published works – not one.

27.     Instead of basing his application on published writings, McLain relied exclusively on legal briefs or memoranda he had written in litigation, which are not peer reviewed or published in any respect.

28.     William McLain also had a record as a poor teacher and was the subject of repeated complaints by students. Despite these shortcomings, UDC favored his candidacy because of his race (Caucasian).

29.     UDC also granted tenure to Mathew Fraiden, a white professor whose scholarly

7

record of achievement was inferior to the body of work presented by Professor Mawakana.

Professor Fraiden presented fewer published articles (three, rather than four), and two of his

writings were derivatives of the same research project. Moreover, unlike Professor Mawakana's

publications, Professor Fraiden was not the sole author for all of his works. Similarly, at least

one of Mr. Fraiden's articles was published in UDC's law review, which ordinarily carries less

weight than an article that was accepted for publication by an unbiased, external source. None of

Professor Fraiden's articles were nominated for significant awards. Nevertheless, UDC granted

Professor Fraiden tenure in 2013 without anything close to the level of scrutiny applied to

Professor Mawakana's candidacy.

30.     UDC also extended its lower scrutiny and less onerous demands with regard to

teaching and service towards Professor Fraiden and white candidates for tenure. Professor

Fraiden was only required to co-teach a legal clinic prior to being awarded tenure. He did not

teach a substantive core first-year doctrinal course like Contracts, which UDC required Professor

Mawakana to teach in addition to co-teaching a legal clinic. Further, with respect to service to

UDC, Professor Fraiden spent extended stays for multiple semesters away from UDC at other

institutions, while Professor Mawakana remained at UDC teaching, producing scholarship and

providing service towards the betterment of UDC.

31.     Like its actions with respect to Professor Mawakana, UDC also rejected the

candidacies of at least two other highly qualified African-American professors in 2012 -- Derek

Alphran and Stephanie Thomas, whose credentials were better than (or at a minimum on par

with) those presented by William McLain and Matt Fraiden. UDC then terminated the

employment of both African-American professors. UDC also discouraged two other African-

American law professors from even applying for tenure, and then terminated their employment as

8

a result.

32.     UDC's actions as described herein evince a pattern, practice, custom and policy of subjecting African-American professors seeking tenure and/or promotion to higher and more onerous standards, than UDC applies to similarly situated white applicants.

33.     Upon learning of the string of tenure denials of competent African-American professors, which culminated with Professor Mawakana's rejection, students from UDC's Black Law School Association and students from the Black Men's Law Society wrote to UDC's administration, questioning whether "UDC-DCSL is employing a dual-tiered tenure process: one for Black law professors, and one for all others."

34.     After refusing to grant Professor Mawakana tenure, UDC further discriminated against him by refusing to afford him a "terminal year" of teaching.  A terminal year is both customary in academia and an accommodation which UDC has afforded to other (and white) professors, but UDC refused it to Professor Mawakana, thus resulting in the termination of his employment effective August 15, 2013.  The refusal to afford Professor Mawakana a terminal year of employment not only caused him the loss of one year's compensation, but further undermined his opportunity to obtain comparable employment in the field of academia.

35.     Defendant's termination of Professor Mawakana's employment has already caused him, and will continue to cause him, significant financial loss (in the form of lost compensation and benefits).

36.     This assault on Professor Mawakana's career has caused him significant emotional distress, damage to his career and reputation, anxiety, humiliation, and loss of enjoyment of life.

37.     The discriminatory actions at issue in this case were taken by the highest officers

of the law school and university, and were wanton, willful and malicious and were intended to

and did cause Kemit Mawakana substantial injuries.

38.     The race discrimination that UDC has engaged in this case is similar to its

unlawful treatment of other highly competent African-American professors, and if left

undeterred, defendant will continue to engage in such egregious and unlawful conduct in the

future.

39.     As an institution, UDC has condoned and ratified this discrimination and at a

minimum has recklessly disregarded Professor Mawakana's rights to be free from such

discrimination.

## Breach of Contract

40.     UDC hired Professor Mawakana on May 10, 2006, pursuant to an initial three

year term contract, which was subject to renewal upon the expiration of the initial term.  UDC

then renewed his contract and it was during the pendency of that renewed contract that defendant

denied Plaintiff tenure and promotion, and denied him a "terminal year" of employment, thus

terminating his relationship with the law school.

41.     Professor Mawakana's contract specifically referenced and adopted the

"Standards and Procedures For Retention And Tenure" enacted by UDC and its faculty.

42.     In addition to being expressly referenced in his personal contract with the

University, the Standards and Procedures for Retention And Tenure were sufficiently clear,

unambiguous and mandatory so as to create an implied contractual agreement to adhere to those

standards and procedures while assessing the candidacy of professors for promotion and/or

tenure, and Plaintiff and other law school professors have reasonably relied upon these promises

when entering into and maintaining their employment with UDC.

43.     The express and/or implied contract between Professor Mawakana and UDC included the following terms: "To determine whether a faculty member is meeting, and is likely to continue to meet, these primary expectations of professional development, evaluations for reappointment, promotion, and tenure *will be conducted according to the following standards and procedures:* . . .Section II, Procedures for Annual Review of Non-Tenured Members of the Faculty and Recommendations Regarding Reappointment: The professional development of each member of the full-time faculty who is not tenured *will be assessed every year.* . . If the faculty member is not a candidate for retention or an applicant for retention, promotion and/or tenure, *the purpose of the annual review will be to provide the non-tenured faculty member with feedback on her or his progress toward meeting the standards for promotion and tenure stated in this document, and to provide supportive guidance and direction toward the successful completion of the promotion and tenure process.* . . . The Chair of the Faculty Evaluation and Retention Committee will appoint a subcommittee of at least two tenured faculty members for each non-tenured faculty member. . . . Each member of a subcommittee will: (1) attend at least two classes and/or two clinic sessions taught by the faculty member; *(2) review the faculty member's scholarly works while in progress and when published*; (3) review the faculty member's community service and DCSL service, and (4) otherwise monitor the faculty member's professional development. . . . *The subcommittee shall meet with the faculty member at least once each academic year to discuss the faculty member's professional development and to counsel the faculty member. The subcommittee will discuss the degree to which her or his performance meets the standards for promotion and tenure stated in this document.* . . . *The Committee of the Faculty Evaluation and Retention Committee will annually evaluate each non-*

11

*tenured faculty member, communicate to each non-tenured faculty member the report of the subcommittee, and provide a written assessment to the Retention and Tenure Committee. "* Standards and Procedures for Retention and Tenure (emphasis supplied).

44.     The purpose of these mandatory procedures was clear and set forth in the contract itself. With respect to the tenure review procedures, they were designed to give advance notice to a faculty member of any significant issues or concerns that might negatively affect his or her candidacy for tenure, with sufficient time for the professor to make adjustments or corrections to address those concerns before a decision is made in the formal tenure review process.

45.     As noted above, UDC hired Professor Mawakana on May 10, 2006. The FERC subcommittee report recommending the denial of his tenure application was dated February 28, 2013. Thus, pursuant to his contract with the University, UDC should have provided Professor Mawakana with six performance reviews and written reports from a FERC subcommittee prior to UDC's consideration of his tenure application, so as to "provide [Plaintiff] with feedback on [his] progress toward meeting the standards for promotion and tenure stated in this document, and to provide supportive guidance and direction toward the successful completion of the promotion and tenure process."

46.     UDC breached this term of the contract. Prior to the FERC subcommittee report recommending that his candidacy for tenure be denied (supposedly due to poor scholarship) UDC did not meet with Professor Mawakana or provide any written report that was critical of his scholarship, or provide any guidance or suggestions for improving his scholarship. To the contrary, on the three occasions in which UDC did provide feedback with respect to Plaintiff's scholarship, the feedback was uniformly positive: "Professor Jefferson is on track with respect to his scholarly activities," (2007) and "Professor Mawakana has a coherent and thoughtful research

12

agenda that dovetails with his teaching areas and supports the mission of the School of Law. Moreover, the early portion of the first article suggests that he is a thoughtful analyst and persuasive writer." (2009); "Professor Mawakana has written a scholarly article that is a 'contribution to the growth and understanding of the law'" and "The team also concluded that Professor Mawakana 'has the potential to be [a] highly productive scholar." (2010).

47.     The only suggestion relating to his scholarship that UDC provided to Professor Mawakana in the 2009 and 2010 written evaluations was to ensure that his articles were published on time: "He will need to complete all three articles within the next two years in keeping with his 'tenure clock.'"

48.     Professor Mawakana complied with this guidance; he not only completed his articles on time, but three of them were published in reputable law review journals by the time his application was considered. At no point prior to rejecting his tenure bid did UDC comply with the obligation to provide Plaintiff with feedback and guidance that would address any putative concerns regarding his scholarship.

49.     John Brittain was serving as the Chair of the Faculty Evaluation and Retention Committee (FERC). In September 2012, Brittain told Professor Mawakana that the review of his application was being delayed, but that it had nothing to do with the merits of his candidacy, and that he was still considered to have a "strong" application and to be on track for tenure. Brittain explained that there were political "fights" over the pending applications of three other professors (Stephanie Brown, Derek Alphran and William McLain) that needed to be resolved before Plaintiff's application moved forward.

50.     Approximately one month later, in October 2012, Dean Broderick called Professor Mawakana to a meeting with John Brittain. At that meeting, Broderick and Brittain

13

tried to convince Professor Mawakana to withdraw his application for tenure, and resign his employment with the University. Dean Broderick warned Plaintiff that if he did not withdraw, the tenured faculty would vote "no" on his application, she would vote "no" on his application, and that a tenure track denial would "ruin your career."

51.     Plaintiff did not withdraw his application for tenure; several months later, a FERC subcommittee (chaired by Brittain) issued the only negative FERC report ever written regarding Professor Mawakana, criticizing his scholarship and recommending against the grant of tenure.

52.     Prior to the October 2012 meeting with Dean Broderick and John Brittain, all of the feedback that Plaintiff had received was favorable on his qualifications for tenure.

53.     UDC's breach of the mandatory procedures set forth in its employment contract with Professor Mawakana caused him damage by failing to afford him a reasonable opportunity to address any real or perceived issues with his scholarship prior to the tenure review process. This breach was a substantial and proximate cause of UDC's denial of tenure and its decision to terminate Professor Mawakana from the University's employment, and has caused Plaintiff financial injury in the form of lost past and future compensation. These damages were reasonably foreseeable to UDC.

### Exhaustion of Administrative Remedies

54.     Professor Mawakana's claims of discrimination under 42 U.S.C. § 1981 and 1983, and his breach of contract claims require no exhaustion of administrative remedies. He has complied with the exhaustion of administrative remedies requirements of Title VII of the Civil Rights Act of 1964, by timely filing a charge of racial discrimination with the United States Equal Employment Opportunity Commission. Plaintiff's claims of discrimination under the District of Columbia Human Rights Act were tolled by that filing. The EEOC issued a notice of

14

right to sue on these claims on August 13, 2014. All prerequisites to suit have been satisfied, and this lawsuit is timely filed.

## VIOLATIONS OF LAW

### COUNT ONE
### (RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT)

55.     Paragraphs 1-53 are re-alleged.

56.     Defendant's actions as described above discriminated against Plaintiff because of his race, in violation of the District of Columbia Human Rights Act and Title VII of the Civil Rights Act of 1964.

### COUNT TWO
### (RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. §§ 1981 AND 1983)

57.     Paragraphs 1-53 are re-alleged.

58.     Defendant interfered with Plaintiff's right to make and enforce contracts protected by 42 U.S.C. § 1981 and 1983, as defendant has maintained a custom or policy of subjecting African-American professors to disparate and more demanding standards for tenure and/or promotion than similarly situated white professors.

### COUNT THREE
### (BREACH OF CONTRACT)

59.     Paragraphs 1-53 are re-alleged.

60.     By denying him tenure and terminating his employment without providing him notice of putative concerns regarding his scholarship, Defendant's actions as described above breached its contractual obligations toward Plaintiff. These actions caused Plaintiff damages

including the loss of his employment, and past and future salary and benefits.

## COUNT FOUR
### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

61.     Paragraphs 1-53 are re-alleged.

62.     By denying him tenure and terminating his employment without providing him notice of putative concerns regarding his scholarship, Defendant's actions as described above breached the implied covenant of good faith and fair dealing underlying the contract between the parties. These actions caused Plaintiff damages, including the loss of his employment, and past and future salary and benefits.

WHEREFORE, Plaintiff requests that this Court:

1)     Declare that Defendant has violated the law, and enjoin Defendant from any further acts of discrimination and/or retaliation against Plaintiff;

2)     Order that Defendant reinstate Plaintiff into his position of employment, with tenure, and promote him to the position of Full Professor, retroactive to the date he was unlawfully deprived of this position;

3)     Order that Defendant make Plaintiff whole for all past financial loss, including back pay and benefits, retroactive to the date of his unlawful termination.

4)     Award Plaintiff compensatory damages in an amount to be proven at trial;

5)     Award Plaintiff punitive damages in an amount to be proven at trial;

6)     If the Court determines, for whatever reason, not to reinstate Plaintiff into his employment with UDC, then alternatively, award Plaintiff front pay to compensate for his future financial loss;

16

7)   Award Plaintiff the costs and reasonable attorneys' fees incurred in this action;

8)   Award Plaintiff pre-judgment interest on all monetary sums requested above;

9)   Award such other relief as the Court deems just.

## JURY DEMAND

Plaintiff requests trial by jury on all issues in this case.

/s/

Richard A. Salzman  422497
Heller, Huron, Chertkof
& Salzman
1730 M St., NW Suite 412
Washington, DC 20036
(202) 293-8090

17

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| **KEMIT MAWAKANA,**<br><br>      **Plaintiff,**<br><br>v.<br><br>**THE BOARD OF TRUSTEES OF THE UNIVERSITY OF THE DISTRICT OF COLUMBIA,**<br><br>      **Defendant.** | **2014 CA 006242 B**<br>**Judge Robert Okun**<br>**Calendar 10** |

### *SUA SPONTE* ORDER

This matter is scheduled for an Initial Scheduling Conference before Judge Okun on Friday, January 2, 2015; however, Judge Okun will not be sitting on that date. Therefore, the Initial Scheduling Conference has been rescheduled to Friday, February 6, 2015, at 9:30 a.m. in Courtroom A-50. To the extent that date does not work for the parties, they may jointly call or jointly email chambers to reschedule to a mutually-agreeable date.

Accordingly, it is this 30th day of October 2014, hereby

**ORDERED** that the Initial Scheduling Conference that was scheduled for Friday, January 2, 2015, is **CONTINUED** to Friday, February 6, 2015, at 9:30 a.m. in Courtroom A-50.

**SO ORDERED.**

_____<br>
Judge Robert Okun<br>
(Signed in Chambers)

Copy via eService:

Richard Salzman
Heller, Huron, Chertkof & Salzman
*Counsel for Plaintiff*

Copy via US Mail:

The Board of Trustees of the University
     of the District of Columbia
4200 Connecticut Avenue, NW
Washington, DC 20008
*Defendant*