**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————————

KEMIT MAWAKANA,                           )
                                          )
              Plaintiff,                  )
                                          )
       v.                                 )          Civil Action No. 14-2069 (ABJ)
                                          )
BOARD OF TRUSTEES OF                      )
THE UNIVERSITY OF                         )
THE DISTRICT OF COLUMBIA,                 )
                                          )
              Defendant.                  )
———————————————————————

## MEMORANDUM OPINION

Plaintiff Kemit Mawakana brings this action against defendant, the Board of Trustees of the University of the District of Columbia, asserting discrimination and contract claims arising from his employment with the University's David A. Clarke School of Law ("the University"), the University's denial of his application for tenure, and his eventual termination.  Compl. [Dkt. #1-1].  Defendant has moved to dismiss plaintiff's contract claims pursuant to Rule 12(b)(6).  Def.'s Partial Mot. to Dismiss [Dkt. # 8] ("Def.'s Mot."); Mem. of P. & A. in Supp. of Def.'s Mot. [Dkt. # 8-1] ("Def.'s Mem.").  The Court finds that plaintiff has not stated a claim for breach of an express contract, but since he has alleged sufficient facts to state a plausible claim that the University breached the terms of an implied contract, the Court will deny defendant's motion.

## BACKGROUND

### I.    Plaintiff's Employment Agreement with the University

In the fall of 2006, the University hired plaintiff for a three-year term as an Assistant Professor of Law on the tenure track.  Compl. ¶¶ 7, 40.  The terms of plaintiff's employment were outlined in a letter from Christine Poole, the Director of the University's Office of Human

Resources.   Ex. 2 to Pl.'s Opp. to Def.'s Mot. [Dkt. # 10-1] ("Appointment Letter").   The

Appointment Letter states that the University's "[c]riteria for retention and promotion shall include

teaching, including case supervision, practice of law, community service, and scholarship as

defined under the School of Law's Standards and Procedures for Retention and Tenure." *Id.* at 1.[1]

The Standards and Procedures for Retention and Tenure defines the criteria upon which

candidates for promotion and tenure will be evaluated:  teaching, scholarship, and service.   Ex. 2

to Def.'s Mot. [Dkt. # 8-2] ("Standards and Procedures") at 2–6; *see also* Compl. ¶ 9.   It also

includes a set of procedural provisions and provides that "[t]he professional development of each

member of the full-time faculty who is not tenured will be assessed every year" by a subcommittee

of the University's Faculty Evaluation and Retention Committee ("FERC"), which consists of "all

tenured members of the faculty other than the Dean."   Standards and Procedures at 6; Ex. 1 to

Def.'s Mot. [Dkt. # 8-2] ("Faculty Handbook") at 26.[2]   The goal of the annual review is to "provide

the non-tenured faculty member with feedback on . . . his progress toward meeting the standards

for promotion and tenure . . . and to provide supportive guidance and direction toward the

successful completion of the promotion and tenure process."   Standards and Procedures at 6–7.

To further that goal, the Standards and Procedures imposes a variety of requirements on

the FERC and its subcommittees as part of the annual review process:

> Each member of a subcommittee will:  (1) attend at least two classes and/or
> two clinic sessions taught by the faculty member; (2) review the faculty

---

[1]      "In determining whether a complaint fails to state a claim, [a court] may consider only the
facts alleged in the complaint, any documents either attached to or incorporated in the complaint
and matters of which we may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621, 624 (D.C. Cir. 1997).  Here, plaintiff incorporated his Appointment Letter and the
Standards and Procedures for Retention and Tenure in his complaint, Compl. ¶¶ 40–41, and the
Court may properly consider those documents in ruling on defendant's motion to dismiss.

[2]      Plaintiff also incorporated the Faculty Handbook in his complaint, Compl. ¶ 10, and so the
Court may properly consider it here.  *St. Francis Xavier*, 117 F.3d at 624.

member's scholarly works while in progress and when published;
(3) review the faculty member's community service and [School of Law]
service, and (4) otherwise monitor the faculty member's professional
development.  The subcommittee will review student evaluations and exams
or other valuable devices and may discuss the faculty member's work with
others in the faculty member's field.

The subcommittee shall meet with the faculty member at least once each
academic year to discuss the faculty member's professional development
and to counsel the faculty member.  The subcommittee will discuss the
degree to which her or his performance meets the standards for promotion
and tenure stated in this document. . . .

The Committee of the Faculty Evaluation and Retention Committee will
annually evaluate each non-tenured faculty member, communicate to each
non-tenured faculty member the report of the subcommittee, and provide a
written assessment to the Retention and Tenure Committee.

*Id.* at 7–8.

The Standards and Procedures also contains the following provision:

The decision of a candidate for renewal and an applicant's application for
promotion and/or tenure will be evaluated solely on the standards in this
document, regardless of:  (1) any prior discussions with, statements made
by, or promises made by any member of the faculty or any other persons or
(2) any failure by the subcommittee, the Faculty Evaluation and Retention
Committee, the Chair of the Faculty Evaluation and Retention Committee,
or any other person to follow the procedural rules contained in this
document.

*Id.* at 11.

## II.    The Denial of Plaintiff's Application for Tenure and His Eventual Termination

At the end of his initial three-year term of employment, plaintiff applied for a promotion

to the rank of Associate Professor, and in October 2010, the University renewed his contract and

promoted him.  Compl. ¶¶ 7, 40.  Plaintiff became eligible to apply for tenure in 2011, and he

submitted his application in July of that year.  *Id*. ¶¶ 7, 10.  On February 28, 2013, the FERC

subcommittee responsible for evaluating plaintiff's application issued a report recommending that

his tenure application be denied.  *Id.* ¶ 45.  It found that plaintiff had satisfied the University's

teaching and service requirements, but that he had not met the scholarship requirement.  *Id.* ¶¶ 12, 15–16, 46.  After the University declined to provide plaintiff with a "terminal year" of teaching, plaintiff's employment with the University was terminated effective August 15, 2013.  *Id.* ¶ 34.

Plaintiff states that, prior to the 2013 FERC subcommittee report, the University did not provide him with any subcommittee feedback suggesting that his scholarship was deficient, and that it therefore breached this term of his contract.[3]  *Id.* ¶ 46.  He asserts that the University's failure to provide him with subcommittee feedback was a substantial cause of the adverse tenure decision and his termination, because it denied him an opportunity to address any defects in his scholarship prior to the consideration of his tenure application.  *Id.* ¶ 53.  Plaintiff also claims that the University breached the implied covenant of good faith and fair dealing underlying his contract by failing to provide him with feedback about his scholarship and his progress toward tenure.  *Id.* ¶ 62.  He alleges that the University's breach has caused him serious financial injury, including loss of employment and loss of both past and future salary and benefits.  *Id.* ¶¶ 53, 60, 62.

After filing a charge with the Equal Employment Opportunity Commission and exhausting his administrative remedies, *id.* ¶ 54, plaintiff filed suit in District of Columbia Superior Court on October 2, 2014, and defendant removed the case to this Court on December 5, 2014.  Def.'s Notice of Removal [Dkt. # 1] ¶ 1.  The complaint contains four counts:  Count I – Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964 and the District of Columbia Human Rights Act; Count II – Race Discrimination in Violation of 42 U.S.C. §§ 1981

---

3       Plaintiff also disputes the University's conclusion that he had failed to satisfy the scholarship requirement:  he states that, during his term at the University, "he had published four articles, three of them in well-respected law review journals, all of high quality," two of which were nominated for "prestigious national awards."  Compl. ¶¶ 19–22.  He asserts that "three of [his articles] were published in reputable law review journals by the time his [tenure] application was considered."  *Id.* ¶ 48.

and 1983; Count III – Breach of Contract; and Count IV – Breach of the Implied Covenant of Good Faith and Fair Dealing. Compl. ¶¶ 55–62. Defendant filed the pending motion to dismiss on February 10, 2015, and it has been fully briefed. Def.'s Mot.; Pl.'s Opp. to Def.'s Mot. [Dkt. # 10] ("Pl.'s Opp."); Def.'s Reply in Supp. of Def.'s Mot. [Dkt. # 12] ("Def.'s Reply").

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citations omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678–79.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550 U.S. at 566.   A pleading must offer more than "'labels and conclusions'" or a "'formulaic recitation of the elements of a cause of action,'" *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## ANALYSIS

Defendant has moved to dismiss Count III and Count IV of the complaint on the grounds that plaintiff "has failed to allege any facts establishing that a valid contract exists between the University and Plaintiff."   Def.'s Mem. at 8.   Plaintiff responds that his Appointment Letter incorporated the Standards and Procedures by reference, giving rise to an express contract – or, at the very least, an implied contract – that the University would follow the annual review process outlined in that document.   Pl.'s Opp. at 6, 11;   *see also* Compl. ¶ 43 (classifying plaintiff's employment agreement as an "express and/or implied contract").   Whether the Standards and Procedures is "considered as part of his express contract with [the University] or deemed to be a component of his implicit contract," plaintiff argues, "the result is the same:  the Standards [and Procedures] are binding."   Pl.'s Opp. at 6.

Under District of Columbia law,[4] "'[t]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the

_____

4      "Under District of Columbia choice-of-law rules, 'a contract dispute is controlled by the law of the state with the most substantial interest in the dispute between the parties.'" *Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 901 F. Supp. 2d 136, 143 (D.D.C. 2012), quoting *Nattah v. Bush*, 770 F. Supp. 2d 193, 208 (D.D.C. 2011).  Plaintiff is a resident of Maryland, but defendant is a District of Columbia entity, plaintiff was employed by defendant in the District, and plaintiff alleges that "the discriminatory and otherwise unlawful actions challenged in this lawsuit occurred in the District of Columbia."  Compl. ¶¶ 3–5, 7.  Therefore, the Court finds that the District of Columbia, and not Maryland or any other jurisdiction, has the most substantial interest in this case, and it will apply District of Columbia law to plaintiff's contract claims.  The parties do not appear to dispute this, as both rely extensively on District of Columbia law in their pleadings.

contract; (3) a breach of that duty; and (4) damages caused by breach.'" *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014), quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). "'[F]or an enforceable agreement to exist . . . there must be both (1) agreement as to all material terms and (2) intention of the parties to be bound.'" *Cambridge Holdings Grp., Inc. v. Fed. Ins. Co.*, 357 F. Supp. 2d 89, 94 (D.D.C. 2004), quoting *Georgetown Entnm't Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985). "An implied-in-fact contract . . . differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C. Cir. 1973).

The Court finds that the annual review process laid out in the Standards and Procedures was not an explicit term of plaintiff's employment agreement, and therefore, he has failed to state a claim that defendant breached an express contract. However, plaintiff has put forth sufficient facts, if just barely, to permit his contract claims to go forward on a theory of implied contract.

I.     **Plaintiff has failed to state a claim for breach of an express contract.**

Plaintiff contends that he "had an express contract to teach at the law school, and that contract incorporated the school's Standards and Procedures for Retention and Tenure," which sets forth the requirement that non-tenured faculty members be given the annual evaluations which plaintiff claims he was denied. Pl.'s Opp. at 1. But plaintiff's express contract claim must fail, because the Appointment Letter is not sufficient to make the processes outlined in the Standards and Procedures a binding term of his employment agreement with the University.

"The District of Columbia adheres to the 'objective law' of contracts, which means that the written language will govern the rights and liabilities of the parties unless it is not susceptible of clear meaning, or unless there is evidence of fraud, duress, or mutual mistake." *Double H*

*Housing Corp. v. Big Wash, Inc.*, 799 A.2d 1195, 1199 (D.C. 2002).   Therefore, "the plain and

unambiguous meaning of a written agreement is controlling, in the absence of some clear evidence

indicating a contrary intention."   *Vogel v. Tenneco Oil Co.*, 465 F.2d 563, 565 (D.C. Cir. 1972).

"[A] contract provision 'is not ambiguous merely because the parties later disagree on its

meaning.'   It is ambiguous only 'if it is reasonably susceptible of different constructions.'"   *Segar*

*v. Mukasey*, 508 F.3d 16, 22 (D.C. Cir. 2007), quoting *Bennett Enters., Inc. v. Domino's Pizza,*

*Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995).   "The 'question [of] whether a contract provision is

ambiguous is a question of law.'"   *Id.*, quoting *Bennett*, 45 F.3d at 497.   And if a court determines

that a contract is not ambiguous, the "interpretation of its plain language is also a question of law."

*Id.*, citing *LTV Corp. v. Gulf States Steel, Inc.*, 969 F.2d 1050, 1055 (D.C. Cir. 1992).

It is clear that the Appointment Letter does not include the annual FERC subcommittee

review procedure as an express term of plaintiff's employment.   In relevant part, the letter states:

> During the third year of this contract, you will receive a formal review by
> the Faculty Evaluation and Retention committee, which will make a
> recommendation to the Dean concerning renewal of your contract.   Criteria
> for retention and promotion shall include teaching, including case
> supervision, practice of law, community service, and scholarship as defined
> under the School of Law's Standards and Procedures for Promotion and
> Tenure.   It is the expectation of the parties that this contract will be renewed
> for an additional three years, and that you will be considered for tenure in
> the fifth year of your employment as a tenure track professor.

Appointment Letter at 1.   Thus, while the Appointment Letter references the Standards and

Procedures as the benchmark for defining "case supervision, practice of law, community service,

and scholarship," it guarantees only that plaintiff will be reviewed at the end of his three-year term,

not that he will receive annual FERC subcommittee reviews regarding his progress toward tenure.

Plaintiff does not argue that the Appointment Letter, on its face, affords him a contractual

right to annual subcommittee feedback.   Rather, he maintains that the letter "specifically

referenced and adopted" the Standards and Procedures, Compl. ¶ 41, and that it "incorporated" the Standards and Procedures' annual evaluation process as an express term of his contract with the University. Pl.'s Opp. at 3, 6. But this claim also fails.

Plaintiff is correct that "'[w]hen a contract incorporates another writing, the two must be read together as the contract between the parties.'" Pl.'s Opp. at 3, quoting *Sheriff v. Medel Electric Co.*, 412 A.2d 38, 41 (D.C. 1980). But "in the absence of 'clear contractual language,'" a contract should not be interpreted as incorporating the terms of another separate document. *Wash. Metro. Area Transit Auth. ex rel. Noralco Corp. v. Norair Eng'g Corp.*, 553 F.2d 233, 235 (D.C. Cir. 1977), citing *John W. Johnson, Inc. v. Basic Constr. Co.*, 429 F.2d 764, 775 (D.C. Cir. 1970). And even where extraneous writings are clearly incorporated by reference, that reference "'renders them part of the agreement for indicated purposes'" only. *Bode & Grenier, L.L.P. v. Knight*, 31 F. Supp. 3d 111, 117 (D.D.C. 2014), quoting *Md.-Nat'l Capital Park & Planning Comm'n v. Lynn*, 514 F.2d 829, 833 (D.C. Cir. 1975); *see also Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 240 U.S. 264, 277 (1916) ("[A] reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified.").

Plaintiff premises his claim that the Standards and Procedures was "specifically referenced and adopted" in his employment agreement on the Appointment Letter's statement that "[c]riteria for retention and promotion shall include teaching, including case supervision, practice of law, community service, and scholarship as defined under the School of Law's Standards and Procedures for Promotion and Tenure." Appointment Letter at 1. But this sentence is not sufficient to transform the Standards and Procedures in its entirety into an express contract.

The plain and unambiguous meaning of the phrase "as defined under the School of Law's Standards and Procedures for Promotion and Tenure" is that the descriptions of the retention and

promotion criteria found in the Standards and Procedures have been incorporated into the employment agreement.  *See* Standards and Procedures at 2–6 (defining those terms).  In other words, to the extent that the Appointment letter expressly incorporated the Standards and Procedures at all, it was only for the limited purpose of importing its definitions of the University's specific *standards* for retention and promotion, and not for providing plaintiff with an express contractual right to all of the *procedures* it also contains.

Express incorporation of an entire document requires more specific evidence of the parties' intention than what is stated in the Appointment Letter.  *See, e.g., Trans-Bay Eng'rs & Builders, Inc. v. Hills*, 551 F.2d 370, 379 (D.C. Cir. 1976) (finding that documents should be construed together where they were "contemporaneously executed as part of one complete package" for "a single [construction] project"); *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 366 (D.C. 1984) (finding express incorporation where sales contract and lease "specifically referred to the lease as an attachment or addendum to the sales contract," leading the court to "constru[e] this hybrid agreement . . . as a whole").  Where, as here, contractual language is "insufficiently specific" to incorporate the entirety of an extraneous document, other courts have rejected claims for breach of those extrinsic terms.  *See, e.g., Noralco Corp.*, 553 F.2d at 234–35 (affirming District Court finding that subcontract language was "insufficiently specific" to incorporate prime contract's dispute resolution clause, where subcontract stated that it was to be performed "in accordance with the terms and provisions of [the prime] Contract . . . [which] are hereby incorporated by reference"); *see also Bode*, 31 F. Supp. 3d at 118 (finding that reference to promissory note in retention letter was "for the limited purpose of explaining the payment schedule for 'legal services

previously rendered' and amounts already owed, as opposed to incorporating the document into the terms applicable to legal fees incurred in the future").[5]

The Court therefore finds that the Appointment Letter's reference to the Standards and Procedures was for a limited purpose, and that it did not create an express contract which incorporates the annual review provisions into plaintiff's employment agreement.  Accordingly, plaintiff's contract claims, insofar as they are based on a theory of express contract, must fail.

## II.   **Plaintiff has alleged sufficient facts to state a claim for breach of an implied contract.**

Plaintiff asserts that, in addition to being an express term of his employment contract, the Standards and Procedures was "sufficiently clear, unambiguous and mandatory so as to create an implied contractual agreement to adhere to those standards and procedures while assessing the candidacy of professors for promotion and/or tenure."  Compl. ¶ 42.  Plaintiff's allegations on this point are thin, but at this early stage in the proceedings, they are sufficient to survive defendant's motion to dismiss.  While the Standards and Procedures contains a provision that would appear on its face to limit plaintiff's ability to allege reliance on or expectation of regular performance reviews, the Court finds that plaintiff has stated a claim that defendant breached an implied contract that arose out of the Standards and Procedures, in combination with the Appointment Letter, the University's Faculty Handbook, and the University's usual customs and practices.

 "Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them.  This is especially true of contracts in and among a community

---

5    *Howard University v. Roberts-Williams*, 37 A.3d 896 (D.C. 2012), cited by plaintiff, is distinguishable, since the defendant in that case did not dispute that the plaintiff's employment contract incorporated the terms of the employee handbook, which included the provision for biannual tenure review upon which the plaintiff's breach of contract claim was based.  *Id*. at 905 n.7 (noting that the breach of contract jury instruction stated "[i]t is undisputed . . . that the relevant portions of the university's handbook constitute a contract").

of scholars, which is what a university is." *Pride v. Howard Univ.*, 384 A.2d 31, 35 (D.C. 1978).

Accordingly, "the usual practices surrounding a contractual relationship can themselves be raised

to the level of a contractual obligation." *Id.* And extraneous documents like an employer's

personnel manual, even where not explicitly incorporated into a contract, can also be considered

as "evidence of the terms and conditions both employer and employee accept as part of the

agreement." *Wash. Welfare Ass'n, Inc. v. Wheeler*, 496 A.2d 613, 615 (D.C. 1985), citing *Green*

*v. D.C. Unemployment Comp. Bd.*, 273 A.2d 479, 480 (D.C. 1971) (where collective bargaining

contract did not provide employees with time off to take care of personal business, such a provision

could be incorporated into contract by evidence from employer's delivery service manual showing

that company recognized such a need and established procedures to provide for it); *see also*

*McConnell v. Howard Univ.*, 818 F.2d 58, 62–63 (D.C. Cir. 1987) ("It is well established that,

under District of Columbia law, an employee handbook such as the Howard University Faculty

Handbook defines the rights and obligations of the employee and the employer, and is a contract

enforceable by the courts."), citing *Greene v. Howard Univ.*, 412 F.2d 1128, 1132 (D.C. Cir. 1969),

*Howard Univ. v. Best*, 484 A.2d 958, 970 (D.C. 1984).

For example, in *Greene*, the D.C. Circuit addressed claims by several non-tenured

professors who alleged that Howard had violated the terms of their employment agreements when

it failed to give them timely notice of its decision not to renew their contracts based upon a finding

of misconduct, and when it denied them an opportunity to be heard on the misconduct allegations

prior to their termination. 412 F.2d at 1131–32. The plaintiffs based their contract claim "not only

on personal assurances from University officials and on their recognition of the common practice

of the University, but also on the written statements of University policy contained in the Faculty

Handbook under whose terms they were employed." *Id.* at 1133. The Court found that it was "the

usual practice of the University" to provide advance notice of termination to non-tenured faculty, and that "[t]his usual practice, of course, can be raised to the level of a contractual obligation." *Id.* at 1133 & n.4.  Finding that the plaintiffs' contracts "comprehend as essential parts of themselves the hiring policies and practices of the University as embodied in its employment regulations and customs," the D.C. Circuit held that "the contractual relationships existing here, when viewed against the regulations prescribed for, and the practices customarily followed in, their administration, required the University . . . to afford the teachers an opportunity to be heard" before terminating their employment.  *Id.* at 1131, 1135.

Similarly, in *Bason v. American University*, 414 A.2d 522 (D.C. 1980), the District of Columbia Court of Appeals found that there was a genuine dispute of material fact precluding summary judgment on the "fundamental issue" of whether the plaintiff, a professor who had been denied tenure, "had a contractual right to be evaluated and kept informed of his progress toward tenure." *Id.* at 525.  The court found that "[t]he answer to that question requires resort to the actual employment contract, those documents expressly incorporated into it (the Faculty Manual, the Bylaws of the Association of American Law Schools, and the 'Standards and Rules of Procedures,' Approval of Law Schools, American Bar Association) and the customs and practices of the University." *Id.*, citing *Pride*, 384 A.2d at 35, *Greene*, 412 F.2d at 1133 n.4.  Based on those elements, the court determined that plaintiff's employment contract was "reasonably susceptible" to the construction that the defendant had a contractual obligation to keep the plaintiff informed of his progress towards tenure, "including notification of deficiencies." *Id.*  Because the existence of

such a contractual right was "a matter for the jury to decide," the Court of Appeals reversed the trial court's grant of summary judgment.  *Id.*[6]

Here, while the Appointment Letter does not specifically incorporate the provisions of the Standards and Procedures, it does reference that document in discussing the University's tenure and promotion process, implying that the Standards and Procedures forms at least part of the basis for the University's tenure practices and decisions.  The Standards and Procedures itself contains a lengthy explanation of the University's standards, policies, and practices for evaluating tenure applicants, and it clearly states that the process is intended to "provide the non-tenured faculty member with feedback on . . . his progress toward meeting the standards for promotion and tenure . . . and to provide supportive guidance and direction toward the successful completion of the promotion and tenure process."  Standards and Procedures at 2–7.  Importantly, its language is mandatory, not permissive:  the Standards and Procedures states that "[t]he professional development of each member of the full-time faculty who is not tenured will be assessed every year," that the FERC Chair "will appoint a subcommittee" for each non-tenured faculty member, that each subcommittee member will attend the candidate's classes, review his scholarly works and community service, and monitor his professional development, and most importantly, that "[t]he subcommittee shall meet with the faculty member at least once each academic year."  *Id.* at 7–8.  This raises a plausible inference that the University intended to be bound by the Standards

---

6       *Bason* is distinguishable from the present case in one material aspect.  In *Bason*, the extraneous documents, including the Faculty Manual, were "expressly incorporated" into the plaintiff's employment contract.  414 A.2d at 525.  While the Court of Appeals did not expand on that phrase, this Court has already determined that the Standards and Procedures was not explicitly made part of plaintiff's employment agreement in this case.  Nevertheless, at this early stage in the proceedings, the Court construes the complaint's allegations in plaintiff's favor and finds that he has alleged sufficient facts to state a plausible claim that the annual tenure review procedures formed part of an implied contract with the University, when considered alongside the other aspects of the University's employment practices discussed in greater detail below.

and Procedures.  *See, e.g.*, *Strass v. Kaiser Found. Health Plan of Mid-Atl.*, 744 A.2d 1000, 1013 (D.C. 2000) (finding that provisions of progressive discipline policy, which were "covered by the mandatory term, 'shall,' rather than the permissive, 'may,'" supported position that the policy was intended "to govern the rights and responsibilities of [the defendant] and its employees").

In addition, the Faculty Handbook also indicates that it is the University's common practice to provide regular, ongoing feedback to non-tenured professors on the tenure track:

> At the beginning of each semester, each member of the faculty who is to be considered for tenure or promotion (including a visitor who may be considered for a tenured position) shall be assigned a three-member review team, appointed by the Faculty Evaluation and Retention Committee.  That review team shall visit the candidate's classes, review his or her writings, counsel with him or her on teaching methods and research projects, and in general be available for constructive help in his or her ongoing association with the school.

Faculty Handbook at 14.  As with the Standards and Procedures, the Faculty Handbook's language regarding the review of a non-tenured professor's writing is mandatory, not permissive.  And it specifically states that it was "formally adopted and approved by the [University's] Board of Trustees."  *Id.* at i.

The existence of these documents and their repeated, mandatory references to the annual tenure review process, along with plaintiff's allegation that he "and other law professors have reasonably relied" on the University's tenure practices and procedures, Compl. ¶ 42, give rise to a plausible inference that the University intended to be bound by the terms of those documents. While the complaint contains little detail about the University's actual customs and practices with regard to other tenured and non-tenured professors, at this early stage, and taking each of these elements together, the Court finds that plaintiff has alleged just enough to state a plausible claim that the combination of the Appointment Letter, the Standards and Procedures, the Faculty

Handbook, and the general customs and practices of the University gave rise to an implied contractual obligation to provide annual reviews to non-tenured faculty.

The Court can take up this issue again after the factual record has been developed. It may well turn out that the University does not routinely follow its own annual review procedures. Or defendant may be able to show that it did not intend to be bound by any of its faculty handbooks or policies. But plaintiff's allegations, when construed in his favor, give rise to inferences concerning the role the written Standards and Procedures actually plays in the University's faculty retention and promotion practices, and there are questions about whether and how it and other policies are enforced, how they are distributed among the faculty, and whether the University customarily provides the annual tenure review to its non-tenured faculty. Until those questions of fact have been answered, plaintiff's complaint sets forth a plausible claim.

Defendant argues that the Standards and Procedures was an agreement exclusively between plaintiff and the FERC, and that defendant was not a party to and never intended to be bound by it, because it "is devoid of any mention of the University as an institution." Def.'s Mem. at 11, citing *Corporate Sys. Res. v. Wash. Metro. Area Transit Auth.*, 31 F. Supp. 3d 124 (D.D.C. 2014). But the Standards and Procedures is not the sole document on which plaintiff's claims are based, and so even if defendant was not a party to that document, it does not resolve the issue. Rather, it is the combination of the Standards and Procedures, the University's other policies, and its customs

and practices that may be found to constitute the implied contract between plaintiff and defendant, and defendant has not shown that it never intended to be bound by that implied contract.[7]

Defendant also argues that even if it had a contractual obligation to provide annual feedback to plaintiff, its failure is excused because plaintiff did not satisfy the condition precedent for the University's performance:  the timely submission of his scholarly materials to the FERC subcommittee for review.  Def.'s Mem. at 13–14, citing Standards and Procedures at 6 ("By October 15 of each year, each non-tenured faculty member shall provide the Committee with a statement describing for the prior year their teaching, scholarship, community and [School of Law] service activities and their plans for the current year."); *see also* Def.'s Reply at 2–3.

Defendant is correct that under District of Columbia law, "'if one contracting party's actions are the cause for another party's failure to satisfy a condition in the contract, he cannot take advantage of the failure.'"  Def.'s Mem. at 13, quoting *Armenian Assembly of Am., Inc. v.*

---

[7]     The only case defendant cites in support of its contention that a defendant must be specifically named in an agreement to make it a party to that agreement is distinguishable.  In *Corporate Systems*, the plaintiff was a subcontractor to a prime contract awarded by defendant WMATA to defendant LTK.  31 F. Supp. 3d at 127.  Although the subcontract referenced WMATA, the plaintiff "had no direct contact" with WMATA and provided services only to LTK.  *Id.* at 130.  The court found that "[o]n its face, the Subcontract does not present any indication that Defendant WMATA intended to be bound by the Subcontract, nor that there was substantial agreement between Defendant WMATA and the plaintiff on all material terms."  *Id.*

Here, in contrast, plaintiff was hired by the University, not the FERC; his employment agreement was with the University, not the FERC; and plaintiff worked for and served the University, not the FERC.  *See* Compl. ¶¶ 7, 40; Appointment Letter at 1.  While it is true that the Standards and Procedures does not specifically mention the University, it is part of the University's "Faculty Policies" handbook, and it was referenced in plaintiff's Appointment Letter, which was sent by the University's Office of Human Resources.  In light of those facts, and plaintiff's claim that he and others relied on the representations contained in the Standards and Procedures, Compl. ¶ 42, the University's intent to be bound by its own written policies is an issue of fact that cannot be resolved on a motion to dismiss.  *See, e.g.*, *Disability Rights Council v. Wash. Metro. Area Transit Auth.*, 234 F.R.D. 1, 3 (D.D.C. 2006) ("[T]he intent of the parties to a contract and what they understood the contract to mean is . . . an issue of fact.").

*Cafesjian*, 758 F.3d 265, 276–77 (D.C. Cir. 2014).  But the condition defendant alleges was a prerequisite to its performance – that plaintiff "submit[] any completed publications for critical review by FERC prior to his July 2011 tenure application," Def.'s Mem. at 14 – does not appear anywhere in the Standards and Procedures.  Rather, that document requires only that plaintiff annually "provide the Committee with a statement describing for the prior year their teaching, scholarship, community and [School of Law] service activities and their plans for the current year." Standards and Procedures at 6.  Without further factual support, the Court cannot find that the plaintiff's alleged failure to make a submission that was not required by the Standards and Procedures is a condition precedent that excuses defendant's nonperformance, and in any event, this is not a legal defect in plaintiff's claim that is apparent from the face of the complaint.[8]

Defendant also claims that plaintiff has failed to show that the University breached the terms of the purported contract, because plaintiff admits that he received feedback from the FERC subcommittee in 2007, 2009, and 2010, prior to submitting his tenure application in July 2011. Def.'s Mem. at 14–16.  First, even if plaintiff did receive written feedback in 2007, 2009, and 2010, the complaint implies that he did not receive the annual meetings provided for in the

---

8      Although the complaint is silent as to whether plaintiff submitted annual statements, it does indicate that he provided the FERC with a draft of at least one of his articles prior to applying for tenure.  Compl. ¶ 22 (stating that the 2010 FERC report recommending that plaintiff be promoted found that he "has written a scholarly article that is a contribution to the growth and understanding of the law").  More importantly, plaintiff does allege that he "met or exceeded *all* of the criteria set forward in the UDC Faculty Handbook and in the 'Standards and Procedures for Retention and Tenure' adopted by UDC and its faculty."  *Id.* ¶ 10 (emphasis original).  While this allegation is somewhat conclusory, construing the complaint liberally in plaintiff's favor, the Court finds that to the extent there was a condition precedent to obtaining feedback from the FERC subcommittee, plaintiff has alleged facts sufficient to show that he satisfied that condition.  *See* Fed. R. Civ. P. 9(c) ("In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed."); *accord Hamilton v. Geithner*, 743 F. Supp. 2d 1, 8 (D.D.C. 2010) (finding that the plaintiff's statement that "the condition precedent to this suit has been satisfied" was permissible under Rule 9(c) and sufficed to state a claim sufficient to survive the defendant's motion to dismiss), *aff'd*, 666 F.3d 1344 (D.C. Cir. 2012).

Standards and Procedures in those years, meaning that the University did not fully comply with its purported contractual obligations. *See* Compl. ¶ 46; Standards and Procedures at 7 ("The subcommittee shall meet with the faculty member at least once each academic year . . . ."). And furthermore, one can infer from the complaint that plaintiff was not given any review or feedback at all in 2011, when he submitted his tenure application, or in 2012, while his tenure application was still pending and well before the FERC subcommittee issued its report recommending that plaintiff's application be denied on February 28, 2013. Compl. ¶¶ 46–51. These allegations are sufficient to state a claim that defendant breached its obligation to provide plaintiff with annual reviews, and defendant's motion to dismiss on this ground will be denied.[9]

Defendant further contends that plaintiff waived his right to sue for any alleged violation of the University's promotion or tenure procedures. Def.'s Mem. at 17–18; Def.'s Reply at 4–5. Defendant relies on the following clause in the Standards and Procedures:

> The decision of a candidate for renewal and an applicant's application for promotion and/or tenure will be evaluated solely on the standards in this document, regardless of . . . any failure by the subcommittee, the Faculty Evaluation and Retention Committee, the Chair of the Faculty Evaluation and Retention Committee, or any other person to follow the procedural rules contained in this document.

Standards and Procedures at 11. "By agreeing to this provision," defendant contends, "Plaintiff acknowledged that the [University's] failure to comply with any of the procedures, such as annual reviews, would not hinder the review of his [tenure] application." Def.'s Mem. at 17. Defendant characterizes this clause as a waiver of plaintiff's right to the annual tenure reviews. *Id.* In

---

9       For the same reason, defendant's assertion that any breach prior to October 2, 2011 is time-barred is not a ground for dismissal of plaintiff's contract claims. *See* Def.'s Mem. at 17, citing D.C. Code § 12-301(7) (setting a three-year statute of limitations for claims based "on a simple contract, express or implied"). Even if his claims based on an alleged breach prior to the fall of 2011 are outside the applicable statute of limitations, plaintiff has plausibly alleged that a breach of the Standards and Procedures' annual tenure review provisions occurred in 2011 and 2012.

response, plaintiff asserts that this clause is instead a disclaimer of defendant's liability for any breach of the procedural guarantees set forth in the Standards and Procedures, and he claims that because this "eviscerating disclaimer" is contrary to the "central purpose of the tenure Standards . . . to give non-tenured faculty members meaningful evaluations once each year," and because it "purport[s] to override university policy," it should not be enforced.  Pl.'s Opp. at 8.

A waiver is "[t]he voluntary relinquishment or abandonment – express or implied – of a legal right or advantage," and it requires a showing that the party alleged to have waived the right "had both knowledge of the existing right and the intention of forgoing it."   Black's Law Dictionary (10th ed. 2014); *see also Schmidt v. Interstate Fed. Sav. & Loan Ass'n*, 74 F.R.D. 423, 427 (D.D.C. 1977).  In contrast, a disclaimer is a "repudiation of another's legal right or claim." Black's Law Dictionary (10th ed. 2014).  Like a waiver, a disclaimer must be sufficiently clear and specific so as to renounce a party's contractual obligations.  *See, e.g.*, *Martin v. Arc of D.C.*, 541 F. Supp. 2d 77, 85 (D.D.C. 2008) ("To repudiate a handbook's binding character, thereby making it 'unenforceable at law,' the handbook must 'contain language clearly reserving the employer's right[s] . . . .'"), quoting *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 746 (D.C. Cir. 1998).  The legal effect of a disclaimer is a question for the court to decide.  *Jackson v. Pub. Co. Accounting Oversight Bd.*, 858 F. Supp. 2d 65, 68 (D.D.C. 2012), quoting *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 806 (D.C. 2003).  But "a disclaimer which is 'rationally at odds with other language' in the document . . . is not dispositive as to whether an implied contract exists, if when construed 'as a whole, a jury could conclude reasonably that the employer intended to be bound by [the] terms'" of the implied contract.  *Dantley v. Howard Univ.*, 801 A.2d 962, 965 (D.C. 2002), quoting *Strass*, 744 A.2d at 1013–14.

Whether the provision at issue is to be assessed as a waiver, a disclaimer, or just another term of the contract, the Court finds that it is not sufficiently clear to enable it to undertake the required analysis.  As discussed above, plaintiff's claim is based not on an express contract created by the Standards and Procedures, but on an implied contract arising out of a combination of the University's policies and procedures, its customs and practices, and other factors that have yet to be discovered.  Since the existence of the implied contract and the extent of its terms have not yet been fully fleshed out, the Court cannot divine the legal effect of the disputed provision at this time, let alone determine whether a jury could reasonably conclude that the clause is "rationally at odds" with the rest of the as-yet-to-be-defined implied contract.  So while it may ultimately be the case that this provision establishes the boundaries of plaintiff's implied contractual right, it may also turn out after discovery that it does not.  In light of the provision, plaintiff will face a high threshold to clear at the summary judgment stage, but the Court finds that it is premature to dismiss his contract claims on that ground at this time.[10]

For those reasons, the Court finds that plaintiff's breach of contract claim in Count III of the complaint survives defendant's motion to dismiss.

---

10     Defendant finally argues that, "[t]o the extent that plaintiff is asserting that he was somehow promised tenure by the Standards and Procedures," that claim must fail.  Def.'s Mem. at 12, citing Compl. ¶ 60.  The Court believes that defendant misconstrues the content of plaintiff's allegations.  The paragraph of the complaint cited by defendant states that, "By denying him tenure and terminating his employment *without providing him notice of putative concerns regarding his scholarship*, Defendant's actions as described above breached its contractual obligations toward Plaintiff."  Compl ¶ 60 (emphasis added).  To the Court, it appears that plaintiff's claims are based on the University's failure to provide him with the annual tenure review feedback outlined in the Standards and Procedures, and not on its ultimate decision to deny him tenure.  But if plaintiff is asserting such a claim, the Court finds that he has not stated sufficient facts to plausibly allege that the University had a contractual obligation to offer him tenure.

### III. Plaintiff has alleged sufficient facts to state a plausible claim for breach of the implied covenant of good faith and fair dealing.

In addition to his breach of contract claim, plaintiff contends that defendant breached the implied covenant of good faith and fair dealing inherent in his employment contract.  Compl. ¶ 62. Defendant argues that this claim should be dismissed "because it is dependent upon the existence of a valid contract."  Def.'s Mem. at 19; Def.'s Reply at 6.   But as with Count III, the Court finds that plaintiff has alleged sufficient facts – if just barely – to state a claim on this count.

"All contracts in the District of Columbia 'contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"[11]  *Brown*, 774 F.3d at 1025, quoting *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000).  "A party breaches this covenant if it 'evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party' to the contract."  *Id.*, quoting *Paul*, 754 A.2d at 310.  "A party does not breach 'its duty of fair dealing when reasonable persons in the parties' shoes would have expected the contract to be performed as it was.'"  *Id.*, quoting *Adler v. Abramson*, 728 A.2d 86, 90–91 (D.C. 1999).

Defendant's argument boils down to the contention that, because plaintiff has not proffered sufficient facts to show the existence of a contract with the University, his claim for breach of the implied covenant of good faith and fair dealing must also fail.  But since the Court finds that plaintiff has adequately alleged the existence of an implied contract, it follows that plaintiff has

---

11    Both express and implied contracts contain this covenant.  *See, e.g., Leyden v. Am. Accreditation Healthcare Comm'n*, No. 1:14-cv-01118 (CRC), 2015 WL 1245976, at *4 (D.D.C. Mar. 18, 2015) (finding that the plaintiff had adequately pled the existence of implied contracts, "along with the implicit covenant of good faith and fair dealing included in those contracts"), citing *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006).

plausibly alleged that defendant has violated the implied covenant of good faith and fair dealing that such a contract would contain.  *See Brown*, 774 F.3d at 1025.  Accordingly, defendant's motion to dismiss Count IV will be denied.

## CONCLUSION

Because plaintiff has alleged sufficient facts to state to a plausible claim that a combination of the Appointment Letter, the Faculty Handbook, the Standards and Procedures, and the general practices and customs of the University created an implied contract between plaintiff and the University, and that defendant breached that contract and the implied covenant of good faith and fair dealing underlying that contract, the Court will deny defendant's partial motion to dismiss.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  July 10, 2015