## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
 )
KEMIT MAWAKANA, )
 )
          Plaintiff, )
 )
    v. )      Civil Action No. 14-2069 (ABJ)
 )
BOARD OF TRUSTEES OF )
THE UNIVERSITY OF )
THE DISTRICT OF COLUMBIA, )
 )
          Defendant. )
———————————————————— )

## MEMORANDUM OPINION

Plaintiff Kemit Mawakana[1] sued the Board of Trustees of the University of the District of

Columbia ("the University") for discrimination and breach of contract after he was denied tenure

by the University's David A. Clark School of Law. The University maintains that its decision was

based on plaintiff's failure to satisfy the scholarship requirement for tenure, but plaintiff alleges

that the denial of his application was actually motivated by racial discrimination, in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the D.C. Human Rights Act,

D.C. Code §2-1402.11 *et seq.*, and 42 U.S.C. §§ 1981, 1983, and that the University breached his

employment contract by failing to provide him with feedback and notice of any concerns about his

scholarship in the years leading up to the tenure application.

Defendant has moved for summary judgment on these claims. For the reasons set forth

below, the Court will grant defendant's motion.

————————————————

1     Plaintiff, who was formerly known as Samuel L. Jefferson, announced his name change in
January of 2010. Def.'s Statement of Material Facts Without Genuine Issue [Dkt. # 35] ("Def.'s
SOF") ¶ 35; Plaintiff's Statement of Genuine Issues [Dkt. # 44] ("Pl.'s SOF") ¶ 35.

## I. FACTUAL BACKGROUND

Tenure in higher education confers a right to permanent employment, with only limited exceptions. Def.'s SOF ¶ 14; Pl.'s SOF ¶ 14. An analysis of plaintiff's claims requires an understanding of the faculty evaluation and tenure process at this particular university.

### A. The University's Performance and Tenure Review Process

A document titled Standards and Procedures for Retention and Tenure sets forth the process to be used to evaluate the professional development of faculty members. Standards and Procedures for Retention and Tenure, Def.'s Ex. 11,[2] ("Standards and Procedures"). According to the Standards and Procedures, faculty members are evaluated on three criteria: teaching, scholarship, and service. *Id.* at 2–6. Full-time, non-tenured faculty are to be assessed annually, *id.* at 6, and non-tenured professors are typically considered for tenure in their fifth year of teaching. Broderick Decl., Def.'s Ex. 1, ¶ 18; *see also* Faculty Handbook, Def.'s Ex. 10, at 14.

For annual performance reviews, faculty members submit an annual statement to the law school's Faculty Evaluation and Retention Committee ("FERC") by October 15 of each year. Standards and Procedures at 6. The annual statement describes the professor's teaching, scholarship, and service activities for the past year and plans for the current year. *Id.*

A FERC subcommittee of two or more tenured faculty members is charged with reviewing the professor's annual statement and work, including: attending classes taught by the faculty member; reviewing the faculty member's "scholarly works while in progress and when published;" reviewing his or her service to the community and the law school; and meeting with the faculty member to discuss his or her professional development. *Id.* at 7–8. The subcommittee prepares a

---

2   Defendant's exhibits appear on the docket at Def.'s Ex. 1 [Dkt. # 35-1]–Def.'s Ex. 89 [Dkt. # 38-18]. A fully executed version of the declaration of Dean Katherine Broderick, Def.'s Ex. 1, appears at [Dkt. # 39].

report for the FERC, and the full FERC evaluates the faculty member, communicates the subcommittee's report to the faculty member, and provides a written assessment to the Retention and Tenure Committee. *Id.* at 8. If the professor is being reviewed for reappointment, the FERC will also recommend whether to reappoint the professor. *Id.*

For applications for tenure, a faculty member submits a tenure application to the FERC. Standards and Procedures at 9–10. A tenure application contains the same type of information about a professor's teaching, scholarship, and service as found in an annual statement, including supporting documents such as student evaluations, classroom materials, information demonstrating his or her "achievements as a legal scholar," such as "copies of scholarly works and other evidence of scholarly pursuits," and anything else the applicant wants the FERC to consider. *Id.*; *see also* Faculty Handbook at 12–15. The scholarship criteria may be satisfied with "at least three published scholarly works of high quality or three scholarly equivalents works related to the practice of law," Standards and Procedures at 4–5, 11, and an applicant "is invited to nominate three or more experts in her or his field or fields for assessment of the applicant's scholarly work." *Id.*

Once submitted, the tenure application undergoes a five-level review. First, a subcommittee of the FERC, comprised of three tenured faculty members, evaluates the application and prepares a draft report with a recommendation for the FERC. Def.'s SOF ¶ 22; Pl.'s SOF ¶ 22; Merger Agreement, Def.'s Ex. 9, at 8; Faculty Handbook at 14. Second, the full FERC reviews the subcommittee's draft report and the applicant's qualifications, votes on whether to recommend tenure, and prepares a final FERC report with the full committee's recommendation. Def.'s SOF ¶ 23; Pl.'s SOF ¶ 23. Third, the Dean of the law school reviews the application and the FERC report, prepares a separate evaluation of the applicant's teaching, scholarship, and

service, and makes a recommendation. Def.'s SOF ¶ 24; Pl.'s SOF ¶ 24. Fourth, the University's Provost[3] receives the application, the FERC tenure report, and the Dean's recommendation and makes his or her own recommendation based on these materials. Def.'s SOF ¶ 25; Pl.'s SOF ¶ 25. Finally, the University's President receives the tenure application, the FERC tenure report, the Dean's recommendation, and the Provost's recommendation and makes a final decision on tenure. Def.'s SOF ¶ 26; Pl.'s SOF ¶ 26.[4]

### B. Plaintiff's Employment

In 2006, plaintiff Kemit Mawakana entered into a three-year employment contract with the University for a tenure-track teaching position. Def.'s SOF ¶¶ 37–39; Pl.'s SOF ¶¶ 37–39. The terms of his employment contract were set out in a May 10, 2016 letter. Appointment Letter, Def.'s Ex. 12. The Appointment Letter provided that in the third year of the contract, plaintiff would "receive a formal review" by the FERC in connection with the contract's renewal, and that "[c]riteria for retention and promotion shall include teaching, including case supervision, practice of law, community service, and scholarship as defined under the School of Law's Standards and Procedures for Retention and Tenure." *Id*. The Appointment Letter stated that it was expected that the contract would be renewed for another three-year term and that plaintiff would be considered for tenure in his fifth year of employment. *Id*.

Plaintiff began work as an Assistant Professor on August 16, 2006. Def.'s SOF ¶ 38; Pl.'s SOF ¶ 38. As anticipated, his contract was renewed for another three-year term in 2009, *see* Def.'s

---

3       The University's Provost is now referred to as its Chief Academic Officer. Def.'s SOF ¶ 25 n.2.

4       Plaintiff does not dispute defendant's description of the tenure review process but disputes the "implication" that the Dean does not influence the decisions of the others involved in the process. Pl.'s SOF ¶¶ 14–26.

SOF ¶ 64; Pl.'s SOF ¶ 64, and in 2010, he was promoted from Assistant Professor to Associate Professor. Def.'s SOF ¶ 89; Pl.'s SOF ¶ 89. Also, in accordance with the Appointment Letter, plaintiff became eligible to apply for tenure in his fifth year of employment, and he submitted a tenure application in July 2011. Def.'s SOF ¶ 93; Pl.'s SOF ¶ 93.

To satisfy the scholarship criteria of the tenure review process,[5] plaintiff submitted four articles with his application:

- *Power and Law, Bait and Switch: Debunking "Law" as a Tool of Societal Change*, 36 Okla. City. U. L. Rev. 93 (2011) ("*Power and Law*"), Def.'s Ex. 42;

- *In the Wake of Coast Federal: The Plain Meaning Rule and the Anglo-American Rhetorical Ethic*, 11 U. of Md. L. J. of Race, Religion, Gender, & Class 39 (2011) ("*Coast Federal*"), Def.'s Ex. 43;

- *Historically Black College and University Law Schools: Generating Multitudes of Effective Social Engineers*, 14 J. Gender, Race & Just. 679 (July 2011) ("*HBCU Law Schools*"), Def.'s Ex. 44; and

- *Ending the Disappearing Act of Affordable Housing in the District of Columbia*, 42 J. D.C. Bar Ass'n (2011) ("*Disappearing Act*"), Def.'s Ex. 45.

Def.'s SOF ¶ 96; Pl.'s SOF ¶ 96.

The evidence shows that plaintiff received the following performance reviews and feedback during his employment at the law school:



---

[5] The scholarship criteria is the only criteria at issue in this case. *See* Compl. [Dkt. # 1-1] ¶¶ 16–17.















## II.   PROCEDURAL BACKGROUND

Plaintiff filed this lawsuit in D.C. Superior Court on October 2, 2014.  Compl.   On December 5, 2014, defendant removed the case to this court.  Def.'s Notice of Removal [Dkt. # 1]. On February 10, 2015, defendant filed a partial motion to dismiss plaintiff's contract claims, Def.'s Partial Mot. to Dismiss [Dkt. # 8], and answered plaintiff's remaining claims.  Def.'s Answer [Dkt. # 7].  On July 10, 2015, the Court granted defendant's motion to dismiss in part and denied it in part, finding that plaintiff failed to state a claim for breach of an express contract but that he stated a claim for breach of an implied contract.  Mem. Op. [Dkt. # 16].  Following discovery by the parties, defendant filed a motion for summary judgment, which is fully briefed.  *See* Def.'s Mot. for Summ. J. [Dkt. # 35] ("Def.'s Mot.") and Def.'s Supp. Mem. and Exhibits [Dkt. # 35–39]

("Def.'s Mem."); Pl.'s Opp. to Def.'s Mot. [Dkt. # 44] (Sealed) ("Pl.'s Opp.");[6] Def.'s Reply in

Supp. of Def.'s Mot. (Sealed) [Dkt. # 49] ("Def.'s Reply").

## III.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The party seeking summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary

judgment, the non-moving party must "designate specific facts showing that there is a genuine

issue for trial."  *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a

reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable

of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236,

1241 (D.C. Cir. 1987).  In assessing a party's motion, the court must "view the facts and draw

reasonable inferences 'in the light most favorable to the party opposing the summary judgment

motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States

v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

---

6        Plaintiff filed a corrected Exhibit 36 on May 16, 2017.  [Dkt. # 48].

# IV.   ANALYSIS

Defendant asserts that it is entitled to summary judgment both on plaintiff's discrimination claims and his contract claims.  It maintains that it denied plaintiff's tenure application because his scholarship did not satisfy the University's tenure standards and that there is insufficient evidence for a reasonable jury to find otherwise.  Def.'s Mem. at 1.  It also contends that it is entitled to summary judgment as a matter of law on plaintiff's contract claims because the claims were untimely, there was no implied contract, and the undisputed evidence shows that defendant did not breach plaintiff's employment contract. *Id*.  Plaintiff maintains that his contract claims were timely filed, there was an implied contract, and that there are disputed material facts about the motives underlying the tenure decision and about whether defendant breached the parties' contract.  Pl.'s Opp. at 3.

## A.   Race Discrimination Claims under Title VII of the Civil Rights Act and D.C. Human Rights Act

Title VII of the Civil Rights Act of 1964 "makes it unlawful for an employer 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race'" or other protected characteristics. *Steele v. Schafer,* 535 F.3d 689, 695 (D.C. Cir. 2008), quoting 42 U.S.C. § 2000e–2(a).  To state a claim under Title VII's anti-discrimination provision, a plaintiff need only establish two elements:  that "(i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne,* 550 F.3d 1191, 1196 (D.C. Cir. 2008), citing 42 U.S.C. § 2000e–16(a).

Plaintiff does not base his claims on direct evidence of discrimination.  In cases in which a plaintiff relies on circumstantial evidence to establish the employer's unlawful conduct, courts apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973). *See Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006). Under that framework, the plaintiff bears the initial burden of establishing a prima facie case. *McDonnell Douglas*, 411 U.S. at 802; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). Once a prima facie case is established, then "[t]he burden . . . must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802; *Holcomb*, 433 F.3d at 896. If the employer makes this showing, then "the burden-shifting framework disappears," and the question before the court is "whether a reasonable jury could infer intentional discrimination . . . from all the evidence." *Carter v. George Washington Univ.,* 387 F.3d 872, 878 (D.C. Cir. 2004).

At the summary judgment stage, where an employee "has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Rather, the "operative question" is whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." *Id.* The Court must then examine the totality of the evidence, including "(1) plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer . . . ." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998).

This same analysis applies to claims under the D.C. Human Rights Act. *See Miles v. Howard Univ.*, 653 F. App'x 3, 9 (D.C. Cir. 2016) (holding that the determination made using the

*McDonnell Douglas* framework under Title VII applies equally to claims under the D.C. Human Rights Act).

A Title VII plaintiff may seek to demonstrate that the employer's explanation for his discharge was pretextual by providing evidence from which a reasonable jury could find that the employer's proffered, lawful reasons for acting are "unworthy of credence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) quoting *Tx. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Showing pretext, though, "requires more than simply criticizing the employer's decisionmaking process." *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014). "Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996), quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992).

"If the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495. And the D.C. Circuit has made it clear that when it uses the word "reasonableness," it is not authorizing the court to sit as a "super-personnel department" that may evaluate the reasonableness of an entity's decision from a business perspective; "[r]ather, the factfinder is tasked with evaluating the reasonableness of the decisionmaker's *belief* because honesty and reasonableness are linked: a belief may be so unreasonable that a factfinder could suspect it was not honestly held." *DeJesus v. WP Company LLC*, 841 F.3d 527, 534 (D.C. Cir. 2016) (emphasis in original).

1.  **Plaintiff Fails to Overcome the Heightened Deference Accorded to Academic Decisions.**

These considerations apply with even more force in the academic context. The Court is required to accord great deference to an educational institution when it undertakes a review of an academic determination. *See, e.g.*, *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment.").[7] A court may not overturn an academic decision "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1109 (D.C. 1999), quoting *Regents of the Univ. of Mich.*, 474 U.S. at 225; *see also Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978) (holding that academic decisions require "expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking").

Indeed, courts apply even more deference to decisions concerning faculty members. A "court must be particularly wary of second-guessing a university's decisions concerning faculty members." *Elam v. Bd. of Trustees of Univ. of D.C.*, 530 F. Supp. 2d 4, 17 (D.D.C. 2007), quoting *Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 879 (8th Cir. 2005) ("The academic setting and complex nature of tenure decisions . . . distinguishes them from employment decisions generally."); *Brown v. George Washington Univ.*, 802 A.2d 382, 385 (D.C. 2002), quoting *Loebl v. New York Univ.*, 255 A.D.2d 257, 257, 680 N.Y.S.2d 495 (N.Y. App. Div. 1998) ("[C]ourts

---

7   Plaintiff argues in a footnote that *Regents of Univ. of Mich. v. Ewing* does not apply because that case involved dismissal of a student, not promotion of a professor, Pl.'s Opp. at 32 n.6, but the same type of academic judgment applies in making both decisions.

should not invade, and only rarely assume academic oversight, except with the greatest caution and restraint, in such sensitive areas as faculty appointment, promotion, and tenure, especially in an institution of higher learning.").  Indeed, decisions about "[f]aculty appointment and promotion are 'quintessential educational issues that go to the very essence of faculty judgments as to qualifications for scholastic employment' and should properly be left to the academic institutions themselves absent a strong showing of improper conduct." *Elam*, 530 F. Supp. 2d at 17, quoting *Brown,* 802 A.2d at 387.  Where the file of an applicant seeking tenure or academic promotion contains "conflicting views of specialized scholars, triers of fact cannot hope to master the academic field sufficiently to review the merits of such views and resolve the differences of scholarly opinion." *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984).  Absent evidence sufficient to support a finding that "disagreement about the scholarly merits of the candidate's academic work . . . [is] influenced by forbidden considerations such as sex or race, universities are free to establish departmental priorities, to set their own required levels of academic potential and achievement and to act upon the good faith judgments of their departmental faculties or reviewing authorities." *Id*. at 94.

Plaintiff asserts that he has come forward with enough circumstantial proof of race discrimination to warrant a jury trial.  Pl.'s Opp. at 24–25.  He points to several positive comments that were made about his work and argues that the evidence would enable a reasonable jury to find that defendant's stated reason for denying his tenure application was pretextual:

- Professor ███████ provided positive comments on an "early draft" of *Power and Law*, and later the article was deemed to sufficient to satisfy the scholarship standard for plaintiff's application to be promoted from Assistant Professor to Associate Professor in 2010.  Pl.'s Opp. at 7–8.

- Professor ███████████ sent plaintiffs a congratulatory email on his presentation to the faculty of "a well-developed draft" his *Coast Federal* article, calling it "creative, well-reasoned and effective as a teaching tool in contracts" that

"has teaching value for a diverse audience." Pl.'s Opp. at 9. Also, the editors of the University of Maryland Journal of Race, Religion, Gender and Class, which published *Coast Federal*, provided positive comments, and the article received honorable mention from ContractsProf Blog. *Id.* Further, external reviewer ██ ████████████████████ article described the piece as "clearly the work of a mature scholar and it authoritatively marks its author as a worthy addition to the tenured faculty of any law school." Pl.'s Opp. at 9–10.

- Plaintiff's colleagues made positive comments on the abstract for the *HBCU Law Schools* article, and Associate Dean for Students ████████████ nominated it for the Duke University Law and Society John Hope Franklin Prize. Pl.'s Opp. at 10.

The fact that these comments were made is not disputed. The record also contains undisputed evidence of less favorable comments.[8] But that circumstance alone does not present a genuine dispute of material fact. The quality of any individual article is not the subject of this opinion or the province of this Court, and an academic disagreement about the merits of plaintiff's work is not enough to foreclose the entry of summary judgment for the institution. The record reflects that each level of review here came to the conclusion that the three articles – whatever had been said about their promise in the initial stages and however they were later received – were not sufficient together to satisfy the law school's scholarship requirement. There was no difference of opinion within the faculty or the administration about the appropriate outcome of the tenure application other than a single positive vote at the full FERC stage. The fact that someone encouraged the plaintiff along the way or had positive things to say about his writing does not show that the consistent opinions expressed at each level of review were not honestly and reasonably held, or that the school's assessment of plaintiff's body of work as a whole was fabricated to paper over a decision that was improperly predicated on his race.

_____

8    The subcommittee generated a single-spaced, twenty-four page critique, including comments from external reviews by law professors from other schools. Subcomm. Report at 9–33.

Furthermore, it is worth noting that Professor ████████ positive comments on *Power and Law* were made about an "early draft." Pl.'s Opp. at 7–8, citing Email from ████████████ to plaintiff (Dec. 29, 2009), Def.'s Ex. 34. And his praise was coupled with a host of stylistic and substantive suggestions for improving the piece. *See* Email from ████████████ to plaintiff (Dec. 29, 2009). The comments from external reviewer ████████████████ were written in 2010 in connection with plaintiff's application for promotion and not the ultimate tenure decision. ████ External Review, Def.'s Ex. 36. Although she concluded at the time that the draft she reviewed satisfied the requirement that it contribute toward the growth and understanding of the law, she also wrote that the "working draft article [was] overly ambitious in its reach and for this reason feels scattered at times." *Id.* The subcommittee – which included Professor ████ – observed three years later that "the article [did] not appear to have undergone much refinement at all since it was in its working draft stage." Subcomm. Report at 15.

> Had the article incorporated even half of the suggestions for improvement that Professor ████████████ recommended, it would have been a better piece of scholarship – more thorough, sufficiently researched, and engaging to read. Without those suggestions having been implemented, the article retains its status as a piece of scholarship that over-promises but under-delivers.

*Id.* So plaintiff has not shown that his selective excerpts from early reviews of this article undermine the legitimacy of the tenure decision.

As for the *Coast Federal* article, ████████████ simply sent plaintiff a congratulatory email about a work in progress – a draft he had presented to the faculty. The published article was externally reviewed by ████████████████████████████ and he did write that the article "skillfully explain[ed] a rather complicated case." ████ External Review, Def.'s Ex. 52. He opined that it was "clearly the work of a mature scholar and it authoritatively mark[ed] its author as a worthy addition to the tenured faculty of any law school." *Id.* But the FERC

subcommittee unanimously disagreed, and it gave reasons for why it did not share ███████ enthusiasm. *See* Subcomm. Report at 19 (explaining that "[a]ssessing the quality of the article depends, however, not just on the boldness and novelty of its viewpoint, but on the intellectual, analytical, and scholarly skills by which the ideas and views presented in the article are articulated, reasoned, and supported" and describing the article as "substandard, frequently rudimentary, and seriously disappointing as an item of recent scholarly work" submitted with a tenure application).[9] The FERC agreed with the subcommittee and not with ██████ FERC 2013 Tenure Report at 3 (adopting the subcommittee's report and recommendation).

Finally, with respect to the *HBCU Law Schools* article, the comments plaintiff puts forward were based solely on an abstract he had circulated, not the article itself. The published piece was externally reviewed by ███████████████████████████████████████ ██████████████████████████████████████ External Review, Def.'s Ex. 56. Professor ████████ wrote that the article "lacked the depth of analysis one would expect from a scholarly article being submitted as part of the tenure review process." *Id.* at 1.

Based on its members' own review of plaintiff's work and its consideration of the opinions it solicited from outside readers, the FERC subcommittee "determined that Professor Mawakana fail[ed] to meet the Scholarship standard because his submitted works present a quality of analytical thinking and research that is simply below the level one might expect from a tenure candidate." Subcomm. Report at 36. The FERC came to the same conclusion. FERC 2013 Tenure Report at 3. The limited evidence that plaintiff has marshalled in his favor is not sufficient to

---

9    Professor ████████ testified that he did not give the ContractsProf Blog award of honorable mention to the article any weight in his review of the article. ████████ Dep. Tr., Def.'s Ex. 5, at 167–69; *see also* ██████ Dep. Tr., Def.'s Ex. 7, at 263–66.

discredit or outweigh the professional judgment exercised by the subcommittee and the FERC, particularly given the level of deference that must be accorded in an academic setting. *See Regents of Univ. of Mich.*, 474 U.S. at 225.

And even if one were to conclude that there was a significant "disagreement about the scholarly merits" of plaintiff's scholarship in the record, plaintiff has pointed to no evidence that would support a finding that this disagreement was "influenced by forbidden considerations such as . . . race." *Zahorik*, 729 F.2d at 94. The Court finds no basis to question the tenure decision here since plaintiff has failed to make any showing, much less "a strong showing," of discriminatory intent. *Elam*, 530 F. Supp. 2d at 17, quoting *Brown*, 802 A.2d at 385.

### 2. Plaintiff Fails to Present Evidence of Discriminatory Intent by Dean Broderick.

It is the plaintiff's burden to produce "evidence sufficient for a reasonable jury to find that the employer's stated reason" for denying his tenure "was not the actual reason and that the employer intentionally discriminated against [him] based on his race." *Brady*, 520 F.3d at 495; *Adeyemi v. Dist. of Columbia,* 525 F.3d 1222, 1226 (D.C. Cir. 2008). Plaintiff argues that he has met this standard based on evidence of the Dean's handling of his and two other African American professors' tenure applications and of the law school's disparate treatment of African American professors compared to white professors. The Court disagrees.

Dean Broderick is at the heart of plaintiff's claim of discrimination. Compl. ¶¶ 8, 49–50; Pl.'s Opp. at 11–14. Although plaintiff asserts that members of the FERC, the Provost, and the President "participated" in discrimination "by allowing themselves to be influenced by an actor with discriminatory intent," Pl.'s SOF ¶¶ 132–33, he testified that he has no knowledge that any of the individuals who sent recommendations *to* Dean Broderick or ruled on the matter *after* she did intentionally discriminated against him. *Compare* Pl.'s Dep. Tr., Def.'s Ex. 2, at 396–97, 401,

403–406, 409, *with id.* at 405 (testimony that plaintiff believes the Dean intentionally discriminated against him because of his race in recommending against tenure); *see Brady*, 520 F.3d at 495 (requiring evidence of intentional discrimination).  Plaintiff asserts that Dean Broderick "put her thumb on the scale" against his application for tenure, and cites statements she made to FERC committee members, as well as the Provost, around the time of his tenure application and review as evidence of her discriminatory intent.  Pl.'s Opp. at 13–14.  But all plaintiff has shown is that she weighed in with her point for view, not that her point for view was tainted by racial animus.

    a. **Evidence of the Dean's Statements about Plaintiff to Members of the FERC**

Plaintiff asserts that "long before the FERC subcommittee drafted its report, Dean Broderick sought to influence a negative recommendation."  Pl.'s Opp. at 12.  First, he points to an email from Professor ▉▉▉▉ to Professors ▉▉▉ and ▉▉ from the spring of 2011, before plaintiff submitted his July 2011 tenure application, to support his claim of discrimination by the Dean.  *Id.*  The email exchange concerned the student evaluations of the plaintiff and how the professors anticipated the Dean might react to them.  Emails among ▉▉▉▉▉▉▉ ▉▉▉▉ and ▉▉▉▉▉▉ (Mar. 29–30, 2011), Pl.'s Ex. 2.  ▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

██████████████████████████████████████████ But none of this established that any racial bias on the part of the Dean entered into her evaluation, and it does not even establish that the Dean in fact placed any, much less too much, weight on student evaluations that Professor ████████ suspected were tainted by racial bias.

Next, plaintiff cites a conversation between the Dean and Professor ████████ which ████████ believed occurred after plaintiff applied for tenure. Pl.'s Opp. at 13, citing ████████ Dep. Tr., Pl.'s Ex. 3, at 86. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████.

Plaintiff also cites a May 2012 email the Dean sent to plaintiff's FERC subcommittee. Pl.'s Opp. at 13. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Ex. 49. She brought this complaint to the subcommittee's attention as "germane to [its] consideration of his application for tenure." *Id.*[10]

Finally, plaintiff cites an email dated Jan. 12, 2013, when the application was still under consideration by the subcommittee, ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████ Pl.'s Opp. at 14, citing Email from ████ ██████to Katherine Broderick (Jan. 12, 2013), Pl.'s Ex. 33. He contends that all of these communications show that the Dean "made sure the FERC subcommittee was keenly aware of her opposition to [his] tenure bid, well before she exercised any formal role in the process," and that the Dean had prejudged his application before the subcommittee had issued its report. Pl.'s Opp. at 14.

While this evidence may reveal that the Dean had concerns about plaintiff's application before the subcommittee issued its recommendation, none of it demonstrates that the Dean's reservations about the plaintiff were racially motivated, and it does not supply grounds for a jury to conclude that the school's stated reasons for denying plaintiff's tenure application were pretextual. Rather, the evidence shows that the Dean identified other legitimate, non-discriminatory reasons for her recommendation against tenure: concerns with plaintiff's teaching

---

10 Plaintiff also points to an August 2012 email from FERC Chair ████████████informing ██████████and ████████████about the Dean's upcoming meeting with the FERC. Pl.'s Opp. at 14, citing Email from ████████████ to ████████████ and ████████████(Aug. 29, 2012), Pl.'s Ex. 32. The meeting was about all of the promotion and tenure applications on the FERC's agenda for the year, not just the plaintiff. *Id.* ████████wrote: "I see this as a courtesy meeting with the deans, to apprise them of the various applications that are in process, or that will shortly be in process. And to learn of any red flags on these applications that deans may have." *Id.* So while the email reveals that a meeting occurred in which the Dean could have provided input, it does not indicate the Dean's views about plaintiff in particular. And it suggests that it was not unusual for the Dean to be engaged in the process before the FERC finalized its recommendation.

and service, the other two criteria considered in the tenure review process. *See* Standards and Procedures at 3–6.

The fact that the Dean had her own view about whether plaintiff satisfied these criteria is not evidence of discriminatory intent. The Standards and Procedures require that the "Dean will prepare a separate evaluation of the applicant's teaching, scholarship, and service" and that she will ultimately make a recommendation relying on both her own "independent evaluation" of plaintiff and the FERC's written report and recommendation. Standards and Procedures at 11.

Further, the record does not indicate that the Dean's comments influenced the subcommittee or the FERC recommendation. FERC members were aware that the Dean was concerned about plaintiff's teaching and service, but the committee denied his application based on its assessment of scholarship. *See* Subcomm. Report. Thus, even if the Dean's criticisms of plaintiff's use of teaching assistants or service were unfair, as plaintiff asserts, Pl.'s Opp. at 13, the FERC specifically found that plaintiff satisfied the teaching and service standards and based its recommendation on its independent review of plaintiff's application.[11]

### b. Evidence of the Dean's Statements about Plaintiff to the Provost

Plaintiff does not suggest that the Provost or University President harbored any bias against the plaintiff based on his race. He argues, though, that the Provost's decision was improperly tainted by the Dean's recommendation.[12] The Supreme Court has recognized that in some circumstances, an employer can be liable for discrimination even in the absence of racial bias on

_____

11      The FERC gave plaintiff "the barest of a 'pass' in deciding that he successfully [met] the Handbook Standard for teaching" and "[i]n the realm of Service, Professor Mawakana again merits a mere 'pass.'" FERC 2013 Tenure Report (adopting the subcommittee's report).

12      It is undisputed that the University President, at the fifth level of the tenure review process, denied plaintiff's tenure application based on the Provost's recommendation. Def.'s SOF ¶ 129; Pl.'s SOF ¶ 129.

the part of the ultimate decision maker if that decision was prompted by an unlawful recommendation made by a lower level supervisor. Under what has been called the "cat's paw" theory of discrimination, a plaintiff must show that "a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and . . . that act is a proximate cause of the ultimate [adverse] action." *Staub v. Proctor Hospital*, 562 U.S. 411, 422 (2011); *see also Morris v. McCarthy,* 825 F.3d 658, 668 (D.C. Cir. 2016) (applying *Staub* to the Title VII context).

But applying the *Staub* theory in this case requires a predicate finding that the Dean acted with discriminatory intent, and there is no evidence on that point. Moreover, the evidence of proximate cause is weak given the Provost's own assessment of the application and the recommendations presented to him. To support his cat's paw theory of discrimination and his claim that the Dean played a significant role "both below and above her formal role in the process," plaintiff asserts without citation to the record that the Dean discussed two other tenure applications – for Professors ███████ and ███████ – with the then-Provost Graeme Baxter before that Provost rejected their applications. Pl.'s Opp. at 34. But he cites no evidence that the Dean discussed *his* application with Provost Ken Bain, who was Provost when plaintiff's application was under review.

Plaintiff complains that defendant presented no evidence that the Provost or President independently reviewed his application, and he asserts that any tenure applicants the Dean opposes do not receive tenure. Pl.'s Opp. at 34. But plaintiff points to no evidence to dispute the Provost's statement that he conducted his own review of "the complete application for tenure of Professor Kemit Mawakana; examples of his scholarly writing; the report submitted by the [FERC]; the recommendation of Dean Shelley Broderick . . . ; and the response from Professor Mawakana to

the FERC report," and that he "found no compelling reason" to overrule the recommendations of the FERC or the Dean. Provost's Tenure Recommendation, Def.'s Ex. 64.

Finally, plaintiff argues that "a jury could rationally believe that the recommendation of a Dean who had been running the law school for more than 15 years carried substantial weight." Pl.'s Opp. at 34. That is not disputed. Def.'s SOF ¶ 25(b)–(c). But that circumstance does not make the organization liable under *Staub* unless there is evidence from which a jury could conclude that the Dean's recommendation was itself racially motivated. So even if a jury could fairly concluded that the Dean's recommendation was the proximate cause of the decisions that followed, plaintiff has not come forward with sufficient evidence to establish a Title VII violation.

### c. Evidence of the Treatment of Other African American Professors Compared to White Professors

Plaintiff also puts forward statistical and comparative evidence of defendant's treatment of other African American professors which he contends supports his claim of discrimination. "Statistical data and comparative information concerning an employer's treatment of minorities is relevant evidence in an individual discrimination claim against that employer" and may be used "to show that the employer's stated reasons for the challenged actions are a pretext." *Minority Employees at NASA (MEAN) v. Beggs*, 723 F.2d 958, 962 (D.C. Cir. 1983), citing *McDonnell Douglas,* 411 U.S. at 804–05 (holding that statistical evidence concerning an employer's "general policy and practice with respect to minority employment" can be used to prove pretext). Plaintiff contends that defendant's failure to grant tenure to him and to two other African-American professors at a time when it promoted white professors with "weak records of scholarship," Pl.'s Opp. at 1–2, demonstrates "a wealth of 'third party' evidence of disparate treatment." *Id.* at 28. In particular, plaintiff asserts that "Dean Broderick figured prominently in each case" of racial discrimination. *Id.* at 15.

Professor #1

First, plaintiff identifies ███████████████████████████████████ as a target of the

Dean's racial discrimination.  Pl.'s Opp. at 28, 33.  ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████  So there is evidence of one other

African-American professor whose appointment the Dean opposed, but her view was shared by

███ members of the FERC.

Professor #2

Plaintiff next asserts that ████████████████████████████████ was the subject of

racial discrimination by the Dean.  Pl.'s Opp. at 16–18.  █████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ the Dean

Professor #2

recommended ██████ for tenure.  Dean's Tenure Recommendation for ████████████████████████

████████ Def.'s Ex. 86.  So this set of facts hardly constitutes an example of an adverse action

by the Dean based on race.

Professor #2

Plaintiff disputes that the Dean supported ██████ tenure application, Pl.'s SOF ¶ 165, but

the Dean's December 8, 2009 recommendation letter to the Provost plainly demonstrates

otherwise:  "I am writing to endorse, unequivocally, the unanimous recommendation of the

Professor #2

[FERC] that the University award tenure to ████████████████████████████████."

Memorandum from Katherine Broderick to Graeme Baxter (Dec. 8, 2009), Def.'s Ex. 86.  It was

Provost Graeme Baxter, not the Dean, who later recommended denying tenure.  Memorandum

from Graeme Baxter to Katherine Broderick (Jun. 30, 2010), Def.'s Ex. 87; Letter from Graeme

Professor #2

Baxter to ████████████, Def.'s Ex. 88.

Professor #1    Professor #2

The record also shows that both ██████ and ██████ sued the University for racial

discrimination after they were denied tenure.  ████████████████████████████████████

████████████████████████████████████████████████████████████

██████.█████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

─────────────────────

██████

████████████████████████████████████████████████████████ ██████

These conclusory statements of opinion are the only evidence of possible discriminatory intent in the record, but none of it is evidence of discriminatory intent on the part of Dean Broderick, and none of it relates to the plaintiff. And more importantly, the situations are not analogous because both [Professor #1] and [Professor #2] received a positive recommendation for tenure from at least one of the five levels of tenure review, while plaintiff received none. *See, e.g.*, FERC Report and Recommendation to Grant Tenure to Professor [Professor #1] Def.'s Ex. 77; FERC

Tenure Recommendation and Report Regarding Professor ██████████ Professor #2 ██████████ Def.'s Ex. 82; Subcomm. Report.[15]

Plaintiff contrasts the denial of tenure for ██████ ██████ Professor #1, Professor #2, and himself with the grant of tenure to three white professors: ██████████ Professor #3, ██████████ Professor #4, and ██████████ Professor #5. Pl.'s Opp. at 20–23. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████

The problem is that all of this evidence invites the Court to weigh in on the merits of the University's academic judgments in a manner that is contrary to the legal principles governing these disputes. More important, even if plaintiff had come forward with compelling and less conclusory evidence contrasting the white professors' scholarship to his, the comparison is of little utility in proving that plaintiff was discriminated against. While plaintiff's materials were reviewed by one set of University officials, the other professors' tenure applications were reviewed by different subcommittee members, and a different Provost and University President. *See* Def.'s Mem. at 23–24; Def.'s SOF ¶¶ 10, 94, 127–29, 136, 138–39, 143, 147–48, 168–72; Pl.'s SOF ¶¶ 10, 94, 127–29, 136, 138–39, 143, 147–48, 168–72. As other courts in this district have observed, for comparator evidence to be useful, plaintiff must point to a similarly situated employee who was treated more favorably by the same deciding official. *See Sledge v. District of Columbia*, 63 F. Supp. 3d 1, 17–18 (D.D.C. 2014), citing *White v. Tapella,* 876 F. Supp. 2d 58, 70 (D.D.C. 2012) and *Cabrera v. U.S. Postal Serv.*, 333 F. App'x 559, 564–65 (Fed. Cir. 2009) (finding a valid comparator in a similarly situated employee outside of a protected class who committed comparable offenses but was punished less severely by the same deciding official); *see also Akosile v. Armed Forces Retirement Home*, 141 F. Supp. 3d 75, 92 (D.D.C. 2015). Here, the

---

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

difference in the evaluators undermines the probative value of the comparison. And while the Dean is the one constant in the tenure process, plaintiff has presented no evidence of discriminatory intent on her part.

██████ ██ ██████ rofessor #2,

Finally, although          ,         , and plaintiff were denied tenure, and plaintiff can point to three white professors he considers unworthy, the record indicates that seven out of eighteen, or 38.88%, of the professors who were awarded tenure since 1995, have been African American. Def.'s SOF ¶ 10; Pl.'s SOF ¶ 10. Plaintiff argues that the award of tenure to three of the African American professors is irrelevant because they received tenure after plaintiff filed his lawsuit.[17] Opp. at 35, *citing Bishopp v. Dist. of Columbia.,* 788 F.2d 781, 788 n.10 (D.C. Cir. 1986). So by plaintiff's count, four out of fifteen, or 26%, of professors receiving tenure since 1995 were African American. But plaintiff provides no other statistics that would indicate the significance of this percentage.

Moreover, the undisputed facts also show that three of the eighteen professors who received tenure after 1995 were granted tenure before Dean Broderick became the Dean. Def.'s SOF at ¶¶ 10–11; Pl.'s SOF ¶¶ 10–11. So their elevation does little to illuminate the Dean's intent. If one considers plaintiff's point that professors granted tenure after he filed suit should not be considered in the Court's analysis, as well as his allegation that the Dean is the source of racial discrimination, the record shows that during her time as Dean, four out of twelve professors receiving tenure, or 33.33%, were African American:

1)      Wilhelmina Reuben-Cooke (African American female)
2)      Louise Howells (Caucasian female)
3)      Christine Jones (African American female)

---

17      Plaintiff states he received no information in discovery about the award of tenure to these three African American professors, Ronald Mason, Stephanie Brown, and LaShanda Adams, because those awards of tenure were so recent. Pl.'s Opp. at 35; Pl.'s SOF ¶ 10.

4) William McLain (Caucasian male)
5) Laurie Morin (Caucasian female)
6) Alice Thomas (African American female)
7) John Brittain (African American male)
8) Susan Waysdorf (Caucasian female)
9) Mathew Fraidin (Caucasian male)
10) Kristina Campbell (Caucasian female)
11) Debra Cohen (Caucasian female)
12) Andrew Ferguson (Caucasian male)

*See* Def.'s SOF ¶ 10; Pl.'s SOF ¶ 10.

Given the lack of evidence elsewhere in the record of racial animus on the part of the Dean, the Court finds that these statistics lend no weight to plaintiff's assertion that defendant's reason for denying his tenure application were pretextual or that the school, in particular the Dean, acted out of bias against African Americans. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339–40 (1977) (stating that statistics are "competent in proving employment discrimination," but cautioning that "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted" and "their usefulness depends on all of the surrounding facts and circumstances").

In sum, the Court finds that the evidence plaintiff submits about the claimed comparator professors presents "disagreement about the scholarly merits of the candidate's academic work," but that the record does not show these disagreements were "influenced by forbidden considerations such as . . . race." *Zahorik,* 729 F.2d at 94. Further, the tenure statistics lend no support to plaintiff's discrimination claims.

The Court holds that based on the record in this case, a reasonable jury could not find that the University's stated reason for denying plaintiff's tenure application were not honestly and reasonably held, and that plaintiff was denied tenure because of his race. Accordingly, defendant is entitled to summary judgment on Count I.

**B.      Race Discrimination Claims under 42 U.S.C. §§ 1981 and 1983**

Plaintiff also files race discrimination claims under 42 U.S.C. §§ 1981 and 1983.  Section 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts" without respect to race.  42 U.S.C. § 1981(a); *Domino's Pizza v. McDonald*, 546 U.S. 470, 474 (2006).  The term "make and enforce contracts" in the statute is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. §§ 1981(b).  Section 1983 provides the remedy for violations of section 1981.  *Brown v. Sessoms*, 774 F.3d 1016, 1021 (D.C. Cir. 2014).

Section 1981 can encompass employment discrimination claims.  *Olatunji v. Dist. of Columbia*, 958 F. Supp. 2d 27, 31 (D.D.C. 2013), citing *Rivers v. Roadway Express,* 511 U.S. 298, 302 (1994) (Civil Rights Act of 1991 states that § 1981 reaches all phases of contractual relationship, including discriminatory contract terminations).   And section 1981 claims are analyzed using same legal standards are Title VII discrimination claims.  *Olatunji*, 958 F. Supp. 2d at 31, citing *Carter v. George Washington Univ.,* 387 F.3d 872, 878 (D.C. Cir. 2004) (applying the *McDonnell Douglas* burden-shifting framework analysis to claims Section 1981 claims).

Plaintiff relies on all the same evidence and arguments he cited for his Title VII claim to support his claims under sections 1981 and 1983.  Pl.'s Opp. at 35–36 (asserting that defendant's "rejection of three well-qualified black candidates, amid uniform acceptance of white applicants for tenure" satisfies plaintiff's burden to produce evidence to support a finding that defendant had a custom or policy of discrimination).  The Court holds that for the same reasons plaintiff failed to show sufficient evidence for a reasonable jury to find that plaintiff's failure to satisfy the scholarship requirement was not the actual reason defendant denied his tenure application for his Title VII claim, plaintiff failed to produce sufficient evidence for his section 1981 and 1983 claims.

*See Sledge*, 63 F. Supp. 3d at 27 (holding section 1983 claim failed where the plaintiff failed to prove discrimination under Title VII under the first prong).

Furthermore, plaintiff's repeated allegation that the Dean was the discriminatory actor in his tenure denial undermines his claim under Sections 1981 and 1983 as a matter of law.

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final governmental policy respecting such activity before the municipality can be held liable.

*Kidwell v. Dist. of Columbia*, 670 A.2d 349, 352 (D.C. 1996), quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 481–83 (1986) (plurality opinion) (internal citations omitted). Since the University President and not the Dean is the final decision maker for tenure decisions, Def.'s SOF ¶ 26(b); Pl.'s SOF ¶ 26(b); Merger Agreement, Def.'s Ex. 9, at 8, the Dean's discretionary actions in the tenure review process do not represent the "official policy" of the University. Accordingly, the Court holds that defendant is entitled to summary judgment as a matter of law on plaintiff's section 1981 and 1983 claims in Count II.

### C.     Claim for Breach of Implied Contract

#### 1.     Plaintiff's breach of contract claim is untimely.

Plaintiff asserts two contract claims based on the Standards and Procedures: 1) that defendant breached an implied term[18] of the employment contract by "denying him tenure and terminating his employment without providing him notice of putative concerns regarding his scholarship," and 2) that the failure to put him on notice breached the contract's implied covenant

---

18     The Court dismissed his claim that defendant breached an express term of the employment contract, so only a claim for breach of an implied contract remains. *See* Mem. Op. [Dkt. # 16].

of good faith and fair dealing. Compl. ¶¶ 42–43, 60, 62. Defendant moves for summary judgment on the grounds that the claims are time-barred under the statute of limitations and that plaintiff cannot prove the alleged breaches. *See* Def.'s Mem. at 34–35, 40–41.

D.C. law imposes a three-year statute of limitations on contract claims, whether express or implied. D.C. Code § 12–301(7); *see also Allison v. Howard Univ.*, 209 F. Supp. 2d 55, 59 (D.D.C. 2002), citing *Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192, 1198 (D.C. 1984) ("To maintain a cause of action on an express or implied contract in the District of Columbia, a plaintiff must bring a lawsuit within three years following the accrual of the claim."). "An action for breach of contract generally accrues at the time of the breach." *Wright v. Howard Univ.*, 60 A.3d 749, 751 (D.C. 2013).

Plaintiff filed his lawsuit on October 2, 2014, so to be timely, he must allege a breach that occurred after October 2, 2011. For both of the contract claims, plaintiff describes the alleged breach as: defendant's "denying him tenure and terminating his employment without providing him notice of putative concerns regarding his scholarship." Compl. ¶¶ 60, 62. Plaintiff alleges that between the time he was hired in May 2006 until the date the FERC recommended denying his tenure application in 2013, he was entitled to "six performance reviews and written reports from a FERC subcommittee prior to UDC's consideration of his tenure application." *Id*. ¶ 45. According to plaintiff, "UDC's breach of the mandatory procedures . . . caused him damage by failing to afford him a reasonable opportunity to address any real or perceived issues with his scholarship prior to his tenure review process." *Id*. ¶ 53. The performance reviews plaintiff claims he should have received were for the academic years of 2006–07, 2007–08, 2008–09, 2009–10, 2010–11, and 2011–12.

Since plaintiff filed suit on October 2, 2014, any claim for breach of contract that occurred after October 2, 2011 – such as one for academic year 2011–12 – would be timely, but any claims for breaches before that would be time-barred. *See* D.C. Code § 12–301(7). Plaintiff takes the position that his contract claims for the earlier years are not untimely because defendant had a "continuing duty to provide [him] with feedback and annual evaluations, and it breached this duty in 2011–12." Pl.'s Opp. at 37.[19] But even assuming that defendant breached a duty to provide feedback and an annual review in academic year 2011–12, that feedback and review would not have "afford[ed] [plaintiff] a reasonable opportunity to address any real or perceived issues with his scholarship prior to his tenure review process," Compl. ¶ 53, since he submitted his tenure application in July 2011, before that academic year began. Def.'s SOF ¶ 93; Pl.'s SOF ¶ 93. Thus, the Court holds that plaintiff's contract claims accrued in the years before he submitted his application for tenure, and he failed to complain of a breach within the limitations period. *See Wright*, 60 A.3d at 752–53 (rejecting argument that breach of contract claim for denial of tenure accrued when the plaintiff was denied tenure, given that his suit rested "on the contrary premise that Howard's alleged breaches injured him well before he was denied tenure, because those breaches deprived him of his rights (1) to be advised of any deficiencies in his performance so that he could correct them before the tenure decision was made, and (2) to be advised of the specific criteria governing tenure determinations, so that he could take timely steps to meet those criteria").

---

19    Plaintiff asserts that "[t]his is sufficient for a jury to find a timely breach of contract claim." Opp. at 37. But whether a claim is filed timely is a question of law for the Court to decide. *See Wright*, 60 A.3d at 751 (reviewing issue of whether breach of contract claim was time-barred de novo); *Seed Co. Ltd. v. Westerman*, 832 F.3d 325, 331 (D.C. Cir. 2016) ("We review the application of the statute of limitations de novo.").

Plaintiff relies on *Kyriakopoulos v. George Washington University*, 866 F.2d 438, 447–48 (D.C. Cir. 1989) to support his continuing duty theory. That case, filed in March 1986, involved a set of breach of contract claims by a professor who alleged, among other things, that the defendant breached his contract by failing to promote him. *Id.* at 445. The district court held that the plaintiff's claims concerning the defendant's denial of promotions in 1976, 1977 and 1978 were barred by the statute of limitations. *Id.* at 440–41. On plaintiff's two claims that the University breached the contract in its 1985 review of the prior decisions in a grievance proceeding, the district court granted summary judgment in favor of the defendant on the basis that the plaintiff "failed to adduce any competent evidence that he in fact merited promotion." *Id.* at 442.

The Court of Appeals agreed that the claims regarding the denials of promotion in the 1970s were time barred, but it remanded the other two counts for the district court to decide based on the complete record. *Id.* at 445–46. In doing so, the Court opined that the pertinent contract provisions established "a *continuing duty* on the part of the University." *Id.* at 445 (emphasis in original). This meant that since "[t]he contract barred the University from considering factors other than [plaintiff's] scholarly merit in the initial promotion decision," if the University used improper criteria in a later review of the initial promotion decision, it would "have committed an independent breach" that may fall within the limitations period. *Id.* "In short, although these two claims (unlike appellant's first three causes of action) avoid the limitations bar, they do so only because recent actions, and recent actions alone, provide the basis for the asserted breach." *Id.*; *see also id.* at 443 ("Rather than 'relating back' and reviving earlier claims, the later actions, . . . act upon the earlier actions merely as a failure to cure any previous breach of contract – a failure that neither constitutes a new breach nor saves appellant's claims from operation of the limitations

bar."). As the Court summarized: "the statute of limitations bars all old claims, but the University is held accountable for any recent, distinct breaches" of a continuing duty. *Id.* at 448. Thus, *Kyriakopoulos* stands for the principle that a claim for breach of a continuing duty may be timely, but only if recent actions within the limitations period "provide the basis for the asserted breach." *Id.*

That is not what happened here. Assuming defendant had a continuing duty to provide plaintiff feedback and annual reviews and failed to do so in academic year 2011–12, as plaintiff asserts, that omission does not provide a fresh basis for a breach of contract claim alleging a failure to afford plaintiff "a reasonable opportunity to address any real or perceived issues with his scholarship prior to his tenure review process," Compl. ¶ 53, because plaintiff filed his tenure application *before* the 2011–12 academic year. So even if defendant breached the contract that year, that breach did not cause the harm of which plaintiff complains. And any breaches of the contract that occurred before October 2, 2011 are time barred. Accordingly, the Court holds that plaintiff's breach of implied contract claim is untimely, and defendant is entitled to summary judgment on Count III as a matter of law.

### 2. Plaintiff has failed to present facts to prove his breach of contract claim.

Even if plaintiff's breach of contract were not time-barred and assuming defendant breached a contractual duty, there is sufficient evidence on the record to show that plaintiff did receive reviews and feedback, and that he declined to avail himself of all the opportunities that were offered. In his first year, academic year 2006–07, plaintiff had an annual review. *See* Def.'s SOF ¶¶ 40–49; Pl.'s SOF ¶¶ 40–49. In his second year, academic year 2007–08, plaintiff failed to submit the required annual statement by October 15, 2007, but in April 2008, Professors ▮▮▮▮ and ▮▮▮▮ invited him to prepare the statement and to meet for an annual review. Def.'s SOF ¶¶ 50–53; Pl.'s SOF ¶¶ 50–53; Email from ▮▮▮▮▮▮▮▮ to ▮▮▮▮▮▮ and plaintiff (Apr.

11, 2008), Def.'s Ex. 24. In his third year, academic year 2008–09, plaintiff submitted a combined annual statement for his second and third years as part of his contract renewal application, and he was evaluated. *See* Def.'s SOF ¶¶ 53–57, 64; Pl.'s SOF ¶¶ 53–57, 64. In his fourth year, academic year 2009–10, plaintiff was again evaluated as part of his application for promotion to Associate Professor. Def.'s SOF ¶¶ 69–70; Pl.'s SOF ¶¶ 69–70.

The record also shows that plaintiff received feedback on his scholarship as part of these evaluations. *See, e.g.,* Draft FERC Annual Report on Prof. Samuel L. Jefferson, Jr., Oct. 1, 2007, Def.'s Ex. 20; Contract Renewal Report, Def.'s Ex. 28, at 13; Def.'s SOF ¶ 67; Pl.'s SOF ¶ 67; Email from ██████ to plaintiff (Nov. 18, 2009), Def.'s Ex. 31; ██████ External Review, Def.'s Ex. 36; Def.'s SOF ¶¶ 84–86; Pl.'s SOF ¶¶ 84–86; 2010 Promotion Report, Def.'s Ex. 33. Further, plaintiff received feedback on his scholarship when he requested it, *see, e.g.,* Def.'s SOF ¶¶ 73–74; Pl.'s SOF ¶¶ 73–74; Email from ██████ to plaintiff (Dec. 29, 2009), Def.'s Ex. 34, and there were also occasions when he declined it when it was offered. *See* Def.'s SOF ¶¶ 62–63; Pl.'s SOF ¶¶ 62–63; Emails between ██████ and plaintiff (July 6–8, 2009), Def.'s Ex. 29. And plaintiff cites to no evidence that he circulated written drafts of either *Coast Federal* or *HBCU Law Schools* in advance of submitting them with his tenure application. *See* Pl.'s Opp. at 9; Email from ██████ to law faculty and deans (Nov. 15, 2010), Pl.'s Ex. 19 (showing only that plaintiff made a lunchtime presentation of his draft *Coast Federal* article to the faculty); Email from ██████ to plaintiff (Sept. 10, 2010), Pl.'s Ex. 26 (showing that Professor ██████ commented on the thesis of the *HBCU Law Schools* article); Email from ██████ to plaintiff (Jul. 29, 2010), Pl.'s Ex. 27 (showing that Professor ██████ reviewed an abstract of *HBCU Law Schools*); Email from ██████ to plaintiff (Oct. 6, 2010), Pl.'s Ex. 28 (showing that plaintiff presented the *HBCU Law Schools* at a faculty lunch).

Viewing this undisputed evidence in the light most favorable to plaintiff, the Court finds that plaintiff has failed to bring forth any issues of genuine material fact concerning his claim that defendant breached the contract by failing to provide him feedback on his scholarship. Accordingly, defendant is also entitled to summary judgment on Count III on this basis.

### D.    Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Finally, plaintiff alleges that defendant breached the implied covenant of good faith and fair dealing.  Compl. ¶ 62.  The covenant, which is included in every contract, *Wright*, 60 A.3d at 754, citing *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006), precludes the parties to the contract from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Paul v. Howard Univ*, 754 A.2d 297, 310 (D.C. 2002) (quotations and citations omitted).  But D.C. law imposes a three year statute of limitations for claims arising out of a breach of the implied duty, *see* D.C. Code § 12-301(7), and therefore, Count IV is untimely and fails for the same reasons as Count III.[20]

### CONCLUSION

For the reasons set forth above, the Court will grant defendant's motion for summary judgment.  This Memorandum Opinion will be docketed under seal at this time.  The Court will

---

[20]    Furthermore, the same undisputed evidence showing that plaintiff received feedback on his progress and scholarship for his breach of contract claim, *see* Section IV.C.2, supports a finding that defendant did not breach the implied covenant of good faith and fair dealing.

issue a separate order concerning entry of a redacted version of the Memorandum Opinion on the public docket.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 28, 2018